Evote HUMPHREY *v.* STATE of Arkansas

CR 97-525 966 S.W.2d 213

Supreme Court of Arkansas
Opinion delivered March 26, 1998
[Petition for rehearing denied April 30, 1998.*]

---

* ARNOLD, C.J., and GLAZE, J., would grant.

*Edwin A. Keaton*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Sandy Moll*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. Evote Humphrey was convicted of capital murder for shooting Tyrone Cook. He was sentenced to life imprisonment without parole. Mr. Humphrey's sole point on appeal is that the Trial Court erred in refusing to instruct the jury on justification. We agree with Mr. Humphrey that the Trial Court's failure to give that instruction was error; thus we reverse and remand.

Mr. Humphrey gave the following testimony. He met Tyrone Cook in 1993, and they occasionally engaged in recreational activities together in Stamps, which was their home town. In 1994, Mr. Cook had an altercation with Meiko McKenzie while others, including Mr. Humphrey, were present. Mr. Cook was shot in the thigh, and he thought that Mr. Humphrey had shot him. Shortly thereafter, Mr. Humphrey, who was with Vernis Mitchell, saw Mr. Cook, who was with Dyran Easter, using a crutch and holding a pistol. They walked past each other. Mr. Cook turned around and accused Mr. Humphrey of shooting him. Mr. Cook then began shooting at Mr. Humphrey who began running away from him down the street. Horace Lowe,

Lacedra Featherston, and two others saw Mr. Humphrey and Mr. Mitchell as they ran.

Mr. Humphrey moved from Stamps to Detroit, Michigan, for a time but returned to Stamps in early April 1995. He observed Mr. Cook drive past his house. He again saw Mr. Cook approximately a week before the April 21, 1995 shooting. Mr. Humphrey and Corey Cheatam were walking down the street when they saw Mr. Cook driving his mother's car. As they passed by the car, Mr. Cook glanced at them and then he quickly drove off and turned the corner. As Mr. Cook's car turned the corner, the trunk opened, and Mr. Cook jumped out. Because Mr. Humphrey believed that Mr. Cook was about to retrieve a gun from the trunk and shoot him, he and Mr. Cheatam ran away. On that day, Mr. Humphrey had with him a pistol he had obtained in Detroit for his protection.

Days later, Mr. Humphrey was standing with several other people, including Dyran Easter, when Mr. Cook drove up in Mr. Cook's mother's car. Mr. Cook asked Mr. Easter if he had seen "him" several times and then he drove off. Mr. Humphrey assumed that Mr. Cook had seen him because he was standing near the car, and Mr. Cook looked in his direction. Mr. Humphrey also had his pistol with him that day.

On April 21, 1995, Mr. Humphrey was at his mother's house with Patrick Stevens and Lamont Reynolds. Mr. Humphrey decided to go to the "dairy" to get something to eat. As they walked, the subject of Mr. Cook did not arise. At some point along the way, Mr. Humphrey saw Mr. Cook who was with James "Bo" Mack on the opposite side of the street. Mr. Cook was wearing a "big" coat even though it was warm outside. When Mr. Humphrey saw Mr. Cook, he became nervous and worried that Mr. Cook was going to shoot him because of the previous encounters, including the one in which Mr. Cook had shot at him. Mr. Humphrey did not see Mr. Cook with a gun, but he thought that he was armed. Mr. Humphrey did not turn around and walk away, as he was afraid to turn his back to Mr. Cook because of the incident in which Mr. Cook shot at him. As Mr. Humphrey walked past Mr. Cook, he watched him to be certain

that Mr. Cook did not pull out a gun. Mr. Cook was also watching Mr. Humphrey. As they passed each other, Mr. Cook asked Mr. Humphrey if he had a problem with him.

Each turned around to face the other. Mr. Cook became angry and asked Mr. Humphrey why he was looking at him. When Mr. Cook reached for something which Mr. Humphrey believed to be a gun, Mr. Humphrey began shooting at him. Mr. Humphrey continued firing his gun, he testified, because Mr. Cook seemed to continue to come at him while reaching for something. He had fourteen rounds in the clip and one round in the chamber. Mr. Humphrey was afraid of Mr. Cook and believed that if he had not shot Mr. Cook, Mr. Cook would have shot him.

Mr. Humphrey's testimony regarding the incidents with Mr. Cook prior to the shooting were corroborated by the testimony of several witnesses. Two witnesses testified as to the incident in which Mr. Cook shot at Mr. Humphrey. Horace Lowe testified that, in the fall of 1994, he walked outside his house and heard a gun shot. He then saw Mr. Humphrey and another young man running. He assumed that the shooter was going to shoot at them again because they were ducking and swerving as they ran. He testified that neither of the two men that ran past his house was carrying a gun.

Lacedra Featherston testified that she saw Mr. Cook, who was using crutches and carrying a pistol, and Dyran Easter walking in front of her home in 1994. Mr. Humphrey and Vernis Mitchell were walking from Mr. Humphrey's home and were further down the street. Mr. Cook, who was standing in front of her house, asked Mr. Humphrey, who was standing down the street, why he shot him. She further testified that she could not hear Mr. Humphrey's response, but that Mr. Cook then pointed his gun at him and said that he was going to kill him. She stated that Mr. Cook then began shooting at Mr. Humphrey, and Mr. Humphrey ran away. She testified that several shots hit a stop sign as Mr. Humphrey ran down the road, that a shot hit the side of a building when Mr. Humphrey ran behind the building, and that Mr. Cook

fired at least five or six shots. She stated that Mr. Mitchell did not run away because Mr. Cook was only shooting at Mr. Humphrey.

Corey Cheatham corroborated Mr. Humphrey's testimony regarding the incident in which Mr. Cook allegedly opened his trunk to get what Mr. Humphrey believed was a gun. He testified that Mr. Cook shut the trunk and got back in the car when they ran away.

Zenolia Hilliard, a rebuttal witness for the State, testified that Mr. Cook was her nephew. She stated that she did not remember him getting shot in 1994 or being on crutches, and she would have known if he had gotten shot. Ms. Hilliard, who lives in Pine Bluff, also stated that if Mr. Cook had seen a doctor or stayed in the hospital, she would have been the one to pay the bill.

Several witnesses of the April 21 shooting testified for the State. There is testimony that Mr. Cook had a gun in his possession several minutes before the confrontation began between him and Mr. Humphrey. There is also testimony that Mr. Cook seemed to be reaching for a gun before Mr. Humphrey shot him and that he did not fall after Mr. Humphrey fired the first shot at him.

Monroe Moore testified that on the night of April 21, as he stopped his van at his brother-in-law's house, he saw Mr. Cook and another person shoving each other. He did not see Mr. Cook with a gun, and Mr. Humphrey was the only person that he saw holding a gun. He did not see whether Mr. Cook reached to his pockets or his pants for a gun, and he did not see Mr. Humphrey reach for his gun. He stated that after Mr. Humphrey shot Mr. Cook one time, Mr. Cook fell to the ground and Mr. Humphrey kept shooting. After the first shot, Mr. Cook attempted to get up and was holding his stomach but that after Mr. Humphrey shot at him four or five times, Mr. Cook stopped moving. Mr. Moore testified that Mr. Humphrey hesitated after the fourth shot and then started shooting again so that Mr. Moore believed that Mr. Humphrey was putting another clip in the gun. Mr. Moore read from an earlier statement that he gave in which he said that after the first shot, Mr. Humphrey said, "I told you mother fucker, I

was not playing this time." Mr. Moore stated that after the shooting, Mr. Humphrey ran away.

Lamont Reynolds testified that on April 21, he and Patrick Stevens were walking with Mr. Humphrey to get something to eat when they saw Mr. Cook. James "Bo" Mack and Dyran Easter were with Mr. Cook. It was a hot day, and Mr. Cook was wearing a coat. He testified that Mr. Cook asked Mr. Humphrey if he had "some beef" with him, and that they began arguing. Mr. Cook began pushing Mr. Humphrey. Mr. Cook then reached for something at his waist under his coat as if he had a gun, but he never saw anything that resembled a gun. He testified that then Mr. Humphrey shot at Mr. Cook fifteen or sixteen times from five to ten feet away, and that he did not remember Mr. Humphrey stopping shooting and then beginning again. He stated that Mr. Humphrey was the only person doing the shooting. Mr. Cook fell after about the fourth shot, and Mr. Humphrey kept shooting after Mr. Cook was lying on the pavement. He testified that Mr. Humphrey was never in close proximity to the body while he was shooting, and that he did not walk around Mr. Cook as he shot at him. After the shooting was over, he saw Mr. Mack walk up to Mr. Cook's body, take something from the body, and put it in his pants. He left the area after the shooting.

Patrick Stevens, Mr. Humphrey's uncle, testified that he was visiting Mr. Humphrey at his house when Mr. Reynolds came over. He stated that he told them that he was going to take a walk across the tracks, and that Mr. Humphrey and Mr. Reynolds went with him. They were walking down the street when they saw Mr. Cook, Dyran Easter, and James "Bo" Mack walking toward them on the opposite side of the street. While Mr. Cook was walking down the street in their direction, Mr. Cook's mother stopped her car to talk to Mr. Cook. She seemed to ask him something, and he pulled his shirt up. She then drove off.

Mr. Stevens stated that about twenty to thirty seconds later, the confrontation between Mr. Cook and Mr. Humphrey began. His testimony as to the subsequent events, which is somewhat confusing, was abstracted as follows:

> [Tyrone] asked Evote did he have a problem with him and Evote told him no, he reached down there and by that time there just heard some shooting going on. When I say reach down there I'm talking about Tyrone. He was like walking down the street then him and Evote he like flinched right here, (Indicating and demonstrating to the jury) he put his hands inside his pants like something like right there (Indicating) but he had on like a coat. I could see his hand his hand went inside his pants like something like something like that. You know I couldn't you know as he was walking down the street hollering. After he said something to him Evote started shooting.

He stated that he did not see Mr. Humphrey walking around Mr. Cook as he shot at him. Once Mr. Humphrey began shooting, he did not stop and he did not change clips. He testified that after the shooting, Mr. Mack took something from the body of Mr. Cook and told him that it was a pager; however, he did not see what the item was.

Alicia Rodgers, a student nurse, testified that after the shooting, she checked Mr. Cook's pulse and raised his shirt to see if he had a heartbeat. She stated that she did not see a pager or a gun.

James "Bo" Mack testified that on April 21, Mr. Cook gave him a gun a couple of minutes before Mr. Cook's mother, who was driving down the street, stopped and asked him if he had a gun with him; however, Mr. Mack admitted that he told the police that he had never seen Mr. Cook with a gun. He testified that Mr. Cook opened up his jacket to show his mother that he did not have a gun. He stated that several minutes after Mr. Cook's mother asked him about the gun, the confrontation between Mr. Cook and Mr. Humphrey occurred. He testified that Mr. Cook did not have the pistol with him at the time that he was shot.

Mr. Mack testified that he and Mr. Cook met Mr. Humphrey and his friends on the street. He stated that Dyran Easter was not with him and Mr. Cook, but that he was standing nearby. He heard the first gunshot before he saw anyone with a gun, and that he then saw Mr. Humphrey as he was shooting at Mr. Cook. He stated that he saw Mr. Humphrey shooting Mr. Cook after he fell to the ground. He stated that the shots were

fired quickly and that he was not certain if the shots stopped before fourteen rounds had been discharged. He testified that they did not say anything to each other or push each other prior to the shooting. Mr. Mack testified that after the shooting, he went to his sister's house, and then he came back to the scene. He testified that he removed the pager from the side of Mr. Cook's jeans pocket after the shooting because it was his. He offered contradicting testimony as to whether he took the pager from Mr. Cook's body before or after he went to his sister's house. He stated that he did not take a gun from Mr. Cook's body after the shooting. He stated that after the shooting, Dyran Easter asked him for the gun that Mr. Cook had given him prior to the shooting, and that he gave it to Mr. Easter.

Several police officers also testified. There was some evidence that Mr. Humphrey may have walked around Mr. Cook's body as he fired some of the shots. There was also some evidence that at least three shots were fired at close range which can be from one foot to ten feet. There was evidence that Mr. Cook was shot five times in the head and neck from above while he was lying in the street. One police officer testified that fourteen nine millimeter spent cartridges were found at the scene.

Peter Briggs, Chief Deputy and Criminal Investigator in Lafayette County, testified that Mr. Humphrey took investigators to a location where they found the nine-millimeter Smith and Wesson pistol that was used in the shooting. He stated that Mr. Humphrey told the investigators that he used the gun in the shooting. There was a fifteen round clip in the weapon and one live round in the barrel. He also stated that none of the evidence supports Mr. Moore's statement that there was a second clip.

Deputy Briggs testified that when he interviewed Lamont Reynolds and Patrick Stevens on either April 21 or 22, 1995, neither of them said that Mr. Cook tried to reach in his waist band for a weapon, and only one of them said that it looked as if Mr. Cook were reaching for something. He also testified, however, that several people told him that it looked as if Tyrone Cook had a gun. He also testified that the witnesses did not see anything that resembled a gun, and that nothing had surfaced in the investiga-

tion that led him to believe that Tyrone Cook had a gun in his possession at the time of the shooting.

Gary Lawrence, an employee at the State Crime Lab in the trace evidence section, testified as an expert on gunshot residue. Based on testing of Mr. Cook's hands, Mr. Lawrence testified that Mr. Cook either fired a gun or his hands were in close proximity of the firearm. He stated that, based on the extraordinary high levels of gunshot residue on the hands, he concluded that the residues were more consistent with the hands being in front of the muzzle end of the firearm than from having discharged a firearm. He also stated that Mr. Cook's hands had to be exposed to have that level of residue.

Dr. Frank Peretti, a forensic pathologist and medical examiner for the State of Arkansas, did an autopsy on the body of Tyrone Cook. He testified that Mr. Cook sustained fourteen gunshot wounds. Seven gunshot wounds were to the right side of the head, and two gunshot wounds were to the right side of the neck. He stated that any one of the seven gunshot wounds to the head would have been fatal, and any one of the two gunshot wounds to the neck would have been fatal. There were two gunshot wounds to the chest, one of which was situated on top of the right shoulder. The shoulder wound was superficial, but the other chest wound would have been fatal. There was a gunshot wound to the abdomen on the left lower quadrant which only involved fatty tissue. There was also a fatal gunshot wound on the left side of the abdomen. There was a wound in the right buttock that would not have been fatal. He testified that, all wounds, even the superficial ones, contributed to death by blood loss. Mr. Cook died of the injuries to the skull and brain and the left side of the chest. He also stated that Mr. Cook bled to death in his chest and abdominal cavities. The only entrance wound to the back of Mr. Cook's body was the wound on his right buttock. He stated that it is very difficult to determine a sequence of shots in a case like this, and that he was unable to determine where a person receiving such wounds was shot first. The superficial wounds are not incapacitating, and one could probably get up and move around. The head wounds could result in some twitching and jerking of the extremities, but the recipient could not get up and walk around. The

neck wound resulted in incapacity, but not immediately. The chest wound would cause rapid bleeding so that "you wouldn't be able to do much with that injury either." He stated that Mr. Cook might have been able to get up and walk around with the abdominal injury alone.

This extensive recitation of the testimony given in this case shows that the primary, if not the only, issue addressed by both the defendant's and the State's evidence was whether Mr. Humphrey shot Mr. Cook with justification. At the close of the evidence, defense counsel proffered a written instruction on justification to be given to the jury. The Trial Court refused to give the instruction.

Arkansas Code Ann. § 5-2-607 (Repl. 1997) provides, in part, as follows:

> (a) A person is justified in using deadly physical force upon another person if he reasonably believes that the other person is:
>
> (1) Committing or about to commit a felony involving force or violence;
>
> (2) Using or about to use unlawful deadly physical force; or
>
> (3) [Added in 1997, and thus not included here.] . . .
>
> (b) A person may not use deadly physical force in self-defense *if he knows that he can avoid the necessity of using that force with complete safety:*
>
> (1) By retreating, except that a person is not required to retreat if he is in his dwelling and was not the original aggressor, or if he is a law enforcement officer or a person assisting at the direction of a law enforcement officer; or
>
> (2) By surrendering possession of property to a person claiming a lawful right thereto. [Emphasis supplied.]

■ ■ We have held that a condition precedent to a plea of self-defense is an assault upon the defendant "of such a character that it is with murderous intent, or places the defendant in fear of his life, or great bodily harm." *Heinze v. State*, 309 Ark. 162, 827 S.W.2d 658 (1992) (citing *Girtman v. State*, 285 Ark. 13, 684 S.W.2d 806 (1985)). A critical issue is the reasonableness of the appellant's apprehension that he was in danger of losing his life or

receiving great bodily injury. *Turner v. State*, 258 Ark. 425, 527 S.W.2d 580 (1975). To justify the assault, it must have appeared that the circumstances were such as to excite the fears of a reasonable person. *Id.* A person is not entitled to act upon his belief that he was in danger, unless it is an honest belief, arrived at without fault or carelessness, and acted upon with due circumspection. *Id.*

■ Because justification is not an affirmative defense, the State has the burden of negating the defense once it is put in issue. *Peals v. State*, 266 Ark. 410, 584 S.W.2d 1 (1979). The defense of justification is a matter of intent and a question of fact for the jury. *Johnison v. State*, 317 Ark. 431, 878 S.W.2d 727 (1994). One who claims self-defense must show not only that the person killed was the aggressor, but that the accused used all reasonable means within his power and consistent with his safety to avoid the killing. *Ricketts v. State*, 292 Ark. 256, 729 S.W.2d 400 (1987). Evidence of specific acts of violence that were directed at an accused or were within his knowledge are probative of what the accused reasonably believed at the time and thus relevant to his plea of self-defense. *Simpkins v. State*, 48 Ark. App. 14, 889 S.W.2d 37 (1994).

■ The law is clear that a party is entitled to an instruction on a defense if there is sufficient evidence to raise a question of fact or if there is any supporting evidence for the instruction. *Yocum v. State*, 325 Ark. 180, 925 S.W.2d 385 (1996). Where the defendant has offered sufficient evidence to raise a question of fact concerning a defense, the instructions must fully and fairly declare the law applicable to that defense; however, there is no error in refusing to give a jury instruction where there is no basis in evidence to support the giving of the instruction. *Id.* *See Doles v. State*, 275 Ark. 448, 631 S.W.2d 281 (1982) ("Justification is not an affirmative defense which must be pled, but becomes a defense when *any evidence* tending to support its existence is offered to support it. [Emphasis supplied.]").

■ The dissent's description of Mr. Cook as an "unarmed man" is a factual determination that must be made by a jury. That description, as well as the dissent's reference to evidence that Mr. Cook was not reaching for his gun and that Mr. Humphrey did not use all reasonable means within his power and consistent with

his safety to avoid killing Mr. Cook, strongly suggests that the dissenters have overlooked the standard for determining when a justification instruction must be given. Our role is not to weigh the evidence to determine if the justification instruction should have been given. Instead, the standard requires that we limit our consideration to whether there is any evidence tending to support the existence of a defense. If there is such evidence, then the justification instruction must be submitted to the jury so that it can make a factual determination as to whether the charged conduct was committed in self-defense.

█ Based on the testimony of Mr. Humphrey as well as the testimony of eyewitnesses, there is clearly some evidence that Mr. Humphrey reasonably believed that Mr. Cook was about to shoot him when he fired at Mr. Cook. There is evidence to support a finding that Mr. Cook shot at Mr. Humphrey on a prior occasion and had acted menacingly toward him on other occasions. There is also evidence that Mr. Cook had a gun in his possession minutes before he encountered Mr. Humphrey. Mr. Cook was wearing a large, black coat on a warm day. Mr. Humphrey as well as other witnesses testified that prior to the shooting, Mr. Cook looked as if he were reaching for a gun in his waistband. Additionally, the investigator testified that other witnesses to the charged crime told him that Mr. Cook looked as if he were reaching for a gun. We recognize that a gun was not found on Mr. Cook's body after the shooting. It is, however, undisputed that Mr. Mack removed something from Mr. Cook's waistband after the shooting and that he was in possession of Mr. Cook's gun after the shooting. Mr. Mack testified that Mr. Cook gave him the gun prior to the shooting and that the item that he retrieved from Mr. Cook's body was a beeper; however, Mr. Mack initially told police that he had never seen Mr. Cook with a gun, and other witnesses testified that they did not see what the retrieved item was. Therefore, there is at least some evidence that Mr. Cook was reaching for a gun in his waistband when Mr. Humphrey shot him, and that Mr. Mack retrieved the gun from Mr. Cook's body after the shooting.

The State argues that the Trial Court correctly withheld the instruction because Mr. Humphrey did not use all reasonable means within his power and consistent with his safety to avoid

killing Mr. Cook because Mr. Humphrey could have turned around when he saw Mr. Cook walking down the street toward him. To the contrary, Mr. Humphrey testified that he was afraid to turn his back to Mr. Cook and walk away because he believed that Mr. Cook would have shot him if he had done so based on the prior incident in which Mr. Cook fired at Mr. Humphrey as he ran from Mr. Cook. There clearly was evidence tending to show that, after the confrontation began, Mr. Humphrey did not know that he could retreat with complete safety because he believed that Mr. Cook was reaching for his gun and was going to shoot at him as he had done in the past. The reasonableness of Mr. Humphrey's belief is supported by the testimony of eyewitnesses who stated that it looked as if Mr. Cook were reaching for a gun as well as the testimony of Mr. Cook's friend, James Mack, that several minutes before the confrontation began, Mr. Cook was in possession of a gun.

 Arkansas Code Ann. § 5-2-607(b) only requires retreat if a person knows that avoidance of the use of deadly physical force can be accomplished with "complete safety." Clearly, based on Mr. Humphrey's experience with Mr. Cook, there is some evidence that Mr. Humphrey did not know that he could retreat with complete safety either when he initially saw Mr. Cook or when the confrontation began.

The State also argues that there was no evidence of self-defense because the force was excessive. In *McCarley v. State*, 257 Ark. 119, 514 S.W.2d 391 (1974), we held that the Trial Court erred in admitting evidence of specific wrongful acts allegedly done by the appellant prior to the incident for which he was tried. In determining whether the error was prejudicial we considered whether other, uncontroverted testimony proved McCarley guilty. One of the issues was self-defense.

Mr. McCarley had testified that the victim was reputed to be a bully and always armed. The State asserted that the theory of self-defense was "merely colorable" because the appellant never saw a gun during the encounter and because any defense of his own person was abandoned when, after having fired at and shot the deceased, the appellant struck him twice with the butt of a

rifle and twice again fired at deceased from behind a tree at the scene. We held that we could not "say with absolute assurance, when all inferences were drawn in favor of McCarley and the situation viewed as it appeared to [him], acting as a reasonable person, his plea of self-defense was totally foreclosed as a matter of law." *McCarley v. State*, 257 Ark. at 124, 514 S.W.2d at 393.

In *People v. Hill*, 642 N.Y.S.2d 222 (A.D. 1 Dept. 1996), the issue was whether a trial court's refusal to instruct the jury as to justifiable homicide was manifest when the People argued that the autopsy testimony of the medical examiner noted six shots to the decedent's head. The court, rejecting the People's argument, stated:

> This contention ignores controlling precedent that when evidence is proffered in support of the defense, "the defendant is entitled to the most favorable view of [that] evidence, a standard which was met in the record before us. Even if the jury were to find that defendant employed excessive force after gaining some control of the gun and repelling the decedent's attack, the People still had the burden of establishing that it was the excessive portion of the force that caused the death. No such showing was made here.

*People v. Hill*, 642 N.Y.S.2d at 223 (citations omitted).

The State has the burden of establishing that any excessive portion of the force used by Mr. Humphrey, as opposed to the alleged initial self-defense response, caused Mr. Cook's death. Although there is evidence that Mr. Humphrey continued to fire at Mr. Cook when arguably any danger to Mr. Humphrey had passed, there is also evidence that Mr. Cook sustained at least one fatal shot prior to the alleged use of excessive force such that any use of excessive force would not be relevant.

The State quotes *Hughes v. State*, 260 Ark. 399-A, 540 S.W.2d 592 (1976) in which we said: "Needless to say, one who engages in an argument with another person is not entitled to kill his adversary merely because he thinks him to have a gun." The testimony in the *Hughes* case was only that the appellant, in an out-of-court statement, told witnesses that "he thought [the victim] had a gun." There is no indication in the *Hughes* case that

there was any testimony that the appellant believed that the victim was reaching for a weapon when he shot him. That contrasts markedly with the testimony given here by Mr. Humphrey and others that it looked like Mr. Cook was reaching for a weapon. Additionally, unlike the evidence in this case, there is no reference to a prior history of life-threatening violence on the part of the victim toward the appellant in the Hughes case.

The State also compares the facts in this case to those in *Burton v. State*, 254 Ark. 673, 495 S.W.2d 841 (1973). In the *Burton* case, this Court, affirming the voluntary manslaughter conviction, stated that if the jury believed that the appellant armed himself and went to a bar in anticipation that the victim would be there and would attack him, or by acts and demonstrations provoked an attack upon himself by the victim, with the intent of killing the victim, or that the appellant voluntarily entered into a contest or duel with the victim, the appellant would be guilty of first degree murder. *Burton v. State*, 254 Ark. at 678, 495 S.W.2d at 844. We said that if those were the circumstances, the homicide would not be justified in self-defense unless the appellant had done everything within his power consistent with his safety to avoid the danger and avert the necessity of the killing. *Id.*

The State argues that the facts in the *Burton* case are similar to the facts in this case because Mr. Humphrey did not report the alleged prior incidents of violence by Mr. Cook. He instead carried a loaded gun when he did not believe that anyone, other than the victim, posed a threat to him. Mr. Humphrey also testified that he was carrying the gun for his protection "against no particular person." This case is distinguishable from the *Burton* case because there is no evidence that Mr. Humphrey walked down the streets of Stamps in anticipation that he would see Mr. Cook so that he could kill him. Even after having been fired upon by Mr. Cook, Mr. Humphrey had foregone several opportunities to shoot Mr. Cook prior to the ultimate confrontation.

Given the conflicting evidence on justification and the fact that the State had the burden of showing that it was the alleged excessive force, rather than the initial response, that

resulted in the death of the victim, we hold it was prejudicial error to have refused the instruction on justification.

Reversed and remanded.

ARNOLD, C.J., and GLAZE and THORNTON, JJ., dissent.

W.H. "DUB" ARNOLD, Chief Justice, dissenting. Evote Humphrey shot an unarmed man to death on a city street, shooting him fourteen times in the head, neck, chest, abdomen, and buttocks, and the majority believes he is entitled to a jury instruction on justification as a defense. Humphrey was charged with and convicted of the capital murder of Tyrone Cook and sentenced by a jury to life imprisonment without parole.

Most importantly, the forensic pathology and trace evidence dictate against a justification instruction. Dr. Frank Peretti, the forensic pathologist and medical examiner for the State of Arkansas, testified that Cook sustained a total of fourteen gunshot wounds: seven right-side head wounds; two right-side neck wounds; two chest wounds; one abdominal wound involving fatty tissue; one left-side abdominal wound; and one right buttock wound. Any one of the seven head wounds was fatal. Any one of the two neck wounds was fatal. One of the two chest wounds was fatal. One of the two abdominal wounds was fatal. Moreover, all the wounds, even the superficial wounds, contributed to Cook's death by blood loss. In all, standing alone, eleven of the fourteen gunshot wounds would have been fatal.

Gary Lawrence, an employee of the State Crime Lab Trace Evidence Section, offers the most compelling testimony mandating against the justification instruction. Mr. Lawrence testified that according to the extraordinarily high levels of gunshot residue on the victim's hands and the fact that the residues were more consistent with Cook's hands being in front of the muzzle end of a firearm — Cook's hands had to have been exposed to have that level of residue. Consequently, the physical evidence demonstrates that Humphrey could see Cook's hands directly in front of him and not, as Humphrey suggests, reaching for a gun. Recall that Cook was unarmed at the time of the shooting but that Humphrey alleges that Cook was continuing to come at him

while reaching for something. The forensic evidence suggests a conclusion to the contrary, that Cook's hands were exposed and visible to Humphrey, negating the basis for a self-defense instruction.

The majority also places great weight on the prior history of Humphrey and his victim, specifically on an incident where Cook shot at Humphrey and Humphrey fled to safety. Again, on the day of the killing, the majority suggests that these two men's paths somehow unavoidably crossed and resulted in Cook's death. However, this meeting was not inevitable. In fact, the victim was walking on the opposite side of the city street with "Bo" Mack, while Humphrey walked with friends on the other side of the street. If the prior incident proves anything, it demonstrates Humphrey's knowledge of the necessity of retreat.

Moreover, during a second encounter with Cook, Cook allegedly drove past Humphrey on the street, stopped his car, and Humphrey believed that Cook was going to retrieve a weapon from his trunk. Humphrey ran away in retreat. I fail to see what distinguishes the fatal incident on April 21, 1995, from either of these prior encounters where Humphrey retreated to safety. In fact, with respect to the first incident, Cook actually had a gun whereas on the day of the fatal shooting Cook was unarmed.

Although Ark. Code Ann. § 5-2-607(a)(3) would permit Humphrey to use deadly physical force upon Cook if Humphrey reasonably believed that Cook was about to use unlawful deadly physical force, Humphrey was prohibited, pursuant to section 607(b), from using deadly physical force in self-defense if he knew that he could avoid the necessity of using that force with complete safety. Humphrey's prior encounters with Cook only strengthen Humphrey's awareness of the advisability and duty to retreat from another meeting.

Additionally, Humphrey was armed in anticipation of a possible conflict, and he voluntarily crossed paths with Cook, rejecting the alternative of retreating from the fatal encounter. *See Burton v. State*, 254 Ark. 673, 495 S.W.2d 841 (1973). Even after the two men met on the street, Humphrey's duty to retreat did not diminish. As the majority concedes, Humphrey was bound to

do everything in his power, consistent with his safety, to avoid danger and avert the necessity of killing. Moreover, to assert a claim of self-defense, Humphrey must prove that (1) Cook was the aggressor, and (2) Humphrey used all reasonable means within his power and consistent with his safety to avoid the killing, including retreat, where retreat can safely be effected. *Martin v. State*, 290 Ark. 293, 718 S.W.2d 938 (1986). Further, there must be some rational basis for submitting a justification instruction to the jury. Where the use of force was avoidable with complete safety, Humphrey is not entitled to a justification instruction. *See id.* at 296-97.

Moreover, the eyewitness testimony of Monroe Moore confirms that Humphrey kept shooting at Cook, even after Cook was on the ground. Humphrey shot Cook fourteen times, and no witnesses testified that they saw Cook with a gun during the shooting, and police investigation revealed no such gun. Although the medical examiner could not conclude which gunshot wound Cook first received, eyewitness testimony indicates that it may have been an abdominal wound. Monroe Moore testified that after the first shot, Cook fell to the ground, holding his stomach. In any event, Humphrey's duty to retreat endured, even after he fired the first gunshot into Cook. Rather than retreat, Humphrey fired again, again, again, again, again, again, again, again, again, again, again, again, and again. The trial court correctly held that there was no rational basis in evidence supporting a justification instruction, and I respectfully dissent.

GLAZE and THORNTON, JJ., join this dissent.