Kimberly SHARP *v.* STATE of Arkansas

CA CR 04-113                                           204 S.W.3d 68

Court of Appeals of Arkansas
Opinion delivered February 23, 2005

*Hatfield & Lassiter*, by: *Jack T. Lassiter*, and *Robert A. Newcomb*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

JOHN B. ROBBINS, Judge. Appellant Kimberly Sharp appeals her conviction for the first-degree murder of Phillip Joiner following a jury trial in Pulaski County Circuit Court. Appellant was sentenced to forty years in prison. Appellant presents six points on appeal as bases for reversal, asserting that the trial court erred by: (1) refusing a jury instruction on the defense of justification; (2) restricting defense counsel in voir dire; (3) limiting defense counsel's examination of appellant's experts regarding her mental state; (4) refusing a modified jury instruction; (5) excluding from evidence an excerpt from a deposition given by the decedent in a divorce proceeding; and (6) excluding the testimony of the divorce attorney concerning divorce proceedings and how that might have affected the decedent's temperament. Because the trial court erred in failing to instruct the jury on the defense of justification, we reverse and remand.

First, we examine the relevant testimony and evidence presented to the jury. As a brief overview, it is undisputed that

appellant ("Kim") shot and killed thirty-nine-year-old Phillip Joiner at approximately 9:00 a.m. on Saturday, August 17, 2002, in the home of Phillip's estranged wife, Lisa Joiner. Phillip had driven to the house to pick up his and Lisa's three-year-old daughter Marina for weekend visitation. Kim was Marina's nineteen-year-old babysitter and was present in the home when Phillip arrived. There was allegedly an argument and physical altercation between Lisa and Phillip, Kim retrieved a gun from inside the house, Kim told Phillip to leave, and when Phillip instead "came at" Kim, she repeatedly shot him.

At trial, a multitude of witnesses testified. Phillip's mother Vivian testified that on that morning, Phillip was living with her pending the divorce, and he left her house to drive to his and Lisa's house in the Otter Creek subdivision to pick up Marina. Vivian testified their marital home was approximately a ten minute drive away, and that her son was happy that morning.

John Conner's house was directly across the street from the Joiners' house. Conner testified that on that morning, he saw Phillip's vehicle parked in front of Conner's house, whereupon he told his wife he was going to go ask Phillip to move it. Conner walked across the street, rang the doorbell, and turned to see his wife back her vehicle out and drive away. No one came to the door, so Conner knocked. Conner said that he could hear a person say, "there's someone at the door, there's someone at the door." Conner said he waited but nobody came to the door, so he walked back to his house to write a note to put on the vehicle.

After returning home, another neighbor, Mr. Reed, came to the Conner residence. Conner testified that Reed lived directly behind the Joiner residence, and Reed asked Conner if he had found out what was going on, to which Conner replied that he had not. Reed told Conner that he had heard three shots. With that, Conner walked back to the Joiner residence and again knocked on the door. In response, he heard the same voice say, "there's someone at the door," he heard the deadbolt slide, and the door came open. The woman (who turned out to be Kim) who answered the door said, "I shot him, I shot him. I can't believe I shot him." The woman handed the telephone to Conner, and he began to talk to the emergency personnel on the phone. The 911 tape pinpointed Kim's call to them at 9:05 a.m., and the personnel were having extreme difficulty understanding what she was saying because she was so distraught.

Conner told them that he observed Phillip, who appeared to be dead, lying in the middle of the living room floor. Conner confirmed that there was a nine millimeter handgun on top of a table just inside the front door. Conner said the woman appeared to be in shock, and he escorted her outside at the operator's request. Conner complied with the operator's other requests by confirming that there was a baby upstairs in a bedroom and determining that no one else was shot. Then, he and Kim waited outside for the police, firemen, and emergency medical personnel.

The associate medical examiner testified that Phillip had sustained six gunshot wounds, some entering from the front and some from the back of the body. Most were in the torso of the body. He could not determine in what order the wounds were sustained.

Lisa testified as follows. Kim had been a babysitter for Lisa since she was sixteen years old, and Lisa had become acquainted with her when Kim's mother took care of Marina as a small infant. Lisa was aware of Kim having some mental problems, but nonetheless felt comfortable with having her care for Marina.

Lisa said that Kim had come over early that Saturday morning to ask Phillip if she could go with him and Marina for breakfast. When Phillip rang the doorbell, Lisa, Kim, and Marina were all upstairs in a bedroom, and Kim went downstairs to answer the door. Lisa said that Phillip's voice sounded agitated, he was calling for Marina, and so she went downstairs as well. Lisa said that as she encountered Phillip in the living room, he was yelling, loud, and obviously angry. She stated that she did not see a punch coming, but she was knocked to the ground and rendered unconscious by his blow to her jaw. Lisa said that the next thing she knew, Phillip was lying on the floor partly under the coffee table and that there was blood. Lisa ran upstairs and shut herself and Marina in an upstairs bedroom. Lisa confirmed that the gun that killed Phillip was given to her by her father, that she had it loaded, and that she kept it atop a large speaker in the downstairs den.

Lisa went to the St. Vincent Hospital emergency room later that same day complaining of a headache and pain in her jaw where Phillip had struck her. A nurse from the hospital confirmed that her jaw was red and that she was hysterical and tearful. The emergency room doctor verified that she had mild swelling but no fractures, which could be consistent with being knocked unconscious. The doctor prescribed her Ativan for anxiety.

Lisa agreed that her and Phillip's divorce would have been final about a week after his death, and that due to his death she inherited about a million dollars. Lisa said that Phillip was the one who filed for divorce, noting that he was unfaithful, but that he filed against her because she had reported him for sexually abusing their daughter. Lisa also claimed that Phillip sexually abused her (Lisa) during the marriage. Lisa believed that Phillip had met with his attorney regarding some of the divorce papers on Friday afternoon, the day prior to the shooting.

Lisa testified that she had shared with Kim in detail her account of Phillip's sexual abuse of Marina, which happened both before and after they separated. Lisa stated that Kim then told her about being sexually abused as a child by her brother. Lisa believed that Kim was disappointed when the Department of Human Services (DHS) concluded that the accusations of abuse against Marina were unsubstantiated. While Lisa wanted to have supervised visitation imposed on Phillip, no such order had been entered in the divorce proceeding. Lisa added that the local law enforcement's investigation of Phillip was not resolved at the time he was killed.

Clinical psychologist Becky Porter testified regarding her treatment with Kim since January 2000 to present. Porter diagnosed Kim as suffering from panic disorder, major depression, and severe anxiety disorder, which Porter said affected her mental state at the time of the shooting. Porter elaborated by stating that Kim had no friends, a minimal social life, and was generally scared of people. Although defense counsel wished to inquire of Porter about Kim's history of childhood sexual abuse by her older brother and its effect on her mental condition, the trial judge excluded that testimony. In a proffer, Porter stated her belief that the early sexual abuse contributed to Kim's depression and anxiety.

Next came the testimony of psychiatrist Joe Bradley. Kim began treatment with Dr. Bradley after being referred by Porter in March 2000, and he had treated her fairly regularly ever since. Dr. Bradley concurred with Porter's diagnoses, and he prescribed her high dosages of anti-depressant and anti-anxiety medications. Dr. Bradley explained that Kim had extreme difficulty in social situations and could interact only with those very familiar to her. He stated that Kim was effectively disabled, could not attend high school or college, and could not hold a full-time job. Though he

would not declare her incompetent or unable to conform her conduct to the requirements of the law, he believed that she was very emotionally disturbed.

Defense counsel sought to introduce the testimony of Lisa's divorce attorney to explain that a week prior to Phillip's death, the attorney had sent documents that included information about the alleged sexual abuse. This was intended to explain why, and to corroborate, that Phillip was angry that Saturday morning. The trial judge excluded that testimony as collateral, and further noted that Lisa had already testified that Phillip was angry and that there was no evidence that Kim would have known why.

Kim took the stand in her own defense. She explained that she had social anxiety issues and had sought the help of Dr. Porter and Dr. Bradley for years. Kim also stated that she was sexually abused by her brother as a child, from her ages of nine to twelve. Kim explained that she had tried shortened high school class days but could not handle it. Ultimately, she simply stayed at home. She had some childcare experience by working in a church nursery. In October 1999, she met Lisa through her mother, who had been Marina's first "main nanny." Kim eventually became the primary babysitter for Marina. Phillip and Lisa were still together at that time.

Kim said that her schedule in the beginning was to care for Marina three days per week, every other week. The Joiners separated in March 2001, and as divorce proceedings advanced, Kim said that transcripts and documents were left on the table in the house, and she had read some parts. Kim said that Lisa had talked to her mother and her about the divorce, that Lisa had told her that Phillip had a history of getting into physical fights, and that she had seen graphic nude pictures of Marina that she believed Phillip had taken. Lisa recalled reading where Phillip admitted to masturbating in front of Marina.

Defense counsel sought to introduce a page of Phillip's deposition testimony to bolster Kim's credibility, but the State objected. The trial judge ruled that he would not admit the document, primarily because it was irrelevant as to whether it was true because the issue was what Kim believed. The proffer of the deposition showed that Phillip admitted that the child often slept in bed with Lisa and Phillip, and that one time Lisa got up to use the bathroom, came back, and saw Phillip masturbating. Phillip clarified that Marina was asleep.

Kim continued her testimony by explaining that by 2002, she and Lisa were spending more time together as friends; the three of them would go out to dinner together. Kim said that on that Saturday, she wanted to spend some time with Marina before Marina had to go, noting that Marina cried when she was told her father was coming to pick her up. Kim said she was at Lisa's house that Saturday morning because Lisa did not like to be alone when Phillip came to get Marina, and also because "I hated Phillip for what he did to Marina, but I thought it would help her if I went to breakfast." When confronted with her admission in a statement to the police that she wanted Phillip to be dead, Kim explained:

> There is a difference between wanting someone dead and wanting someone to leave someone alone. I told the police I wanted him dead, but I had never planned it. . . . It had crossed my mind, I had spent some time thinking about it, and I told the police that in response to the police officer's questions.

Kim expressed fear of Phillip because she said he knew that she had signed an affidavit in the divorce proceedings swearing that Marina had told her that Phillip had touched Marina's "privates" with his "privates." Kim was unequivocal on the stand, describing Phillip as "pretty despicable."

Going back to the events of that morning, Kim said that Lisa sent her down to answer the door to ask Phillip for a few more minutes to get Marina ready because Marina was still in her pajamas. Phillip stepped inside the door, but when she asked him to wait outside, he pushed past her and began to call for Marina. Kim remembered that Lisa came down and told him that she wanted him to wait outside for just a minute, but then he punched Lisa in the jaw. According to Kim, Phillip watched Lisa drop to the floor, he did not help her up, and he continued to look angry. Kim testified that she was scared and that her first thought was to go get the gun, which she knew was kept downstairs. Upon return, she saw that Lisa was up on her feet and that they were in close proximity to one another, arguing. Kim described what happened next:

> I had the gun in my hand and at my side, and I tried to say, you know, as forcible as I can, I said Phillip, you need to leave. . . . I was terrified. I know all of the other things that he's done and was capable of that he did. . . . I didn't know what else he was going to do. . . . I thought he was going to keep going at Lisa, and hit her

again, or do something, and once he was done with her, he was probably going to do something to me. And then there was nobody there to protect Marina because she was upstairs. ... I had told him to leave, and when I said that, Lisa stepped back or, I guess to the side, stepped away from me, and, and he looked right at me, and his eyes were still so angry. And, then, I mean you could see how mad he was. He started to come at me, and my hand just raised the gun, and I started firing.

Kim said she had never fired a gun until that day. Kim said she continued to pull the trigger, remembering that the first shot did not stop him from coming, and said she realized what had happened after the gun quit expelling bullets. Lisa ran upstairs to Marina and closed the door behind her. Kim went to the kitchen and called 911.

The 911 tape was played for the jury, and in it, Kim immediately told them that she shot a man and that she needed an ambulance. Both the operator and the ambulance personnel had a difficult time understanding her because Kim was so panicked and upset. Once Kim answered the door to the neighbor, emergency personnel asked her to let them speak with the neighbor, and he took over at that point. Once officers arrived, Kim was sitting on the front porch area crying and repeating that she had shot him. Officers found Lisa and Marina in an upstairs bedroom.

On cross-examination, Kim agreed that she did not call 911 until after Phillip had been shot, and she agreed that she did not seek aid from neighbors nor did she retreat upstairs where Marina was.

At the conclusion of the case, jury instructions were considered. Defense counsel submitted jury instructions on the use of deadly force in defense of a person, also known as the justification defense; AMCI2d 705. The trial court refused to give that instruction on the basis that the whole case was tried on the theory that Kim reacted the way she did due to a severe emotional disturbance, consistent with a manslaughter instruction. The judge stated that there was not even the slightest evidence to show that she acted in self defense or defense of others, particularly where her use of force was excessive and there was a means to retreat.

After considering first and second-degree murder and manslaughter, the jury returned a guilty verdict on first-degree murder. Appellant was sentenced to a forty-year prison term. This appeal resulted.

■■ The first issue on appeal is whether the trial court erred in not instructing the jury on justification. The law is clear that a party is entitled to an instruction on a defense if there is sufficient evidence to raise a question of fact or if there is any supporting evidence for the instruction. *Yocum v. State*, 325 Ark. 180, 925 S.W.2d 385 (1996). Where the defendant has offered sufficient evidence to raise a question of fact concerning a defense, the instructions must fully and fairly declare the law applicable to that defense; however, there is no error in refusing to give a jury instruction where there is no basis in evidence to support the giving of the instruction. *Id; see Doles v. State*, 275 Ark. 448, 631 S.W.2d 281 (1982) ("Justification is not an affirmative defense which must be pled, but becomes a defense when any evidence tending to support its existence is offered to support it."). The standard of our review on appeal has been expressed as follows:

> Our role is not to weigh the evidence to determine if the justification instruction should have been given. Instead, the standard requires that we limit our consideration to whether there is *any* evidence tending to support the existence of a defense. If there is such evidence, then the justification instruction *must* be submitted to the jury so that it can make the factual determination as to whether the charged conduct was committed in self-defense.

*Humphrey v. State*, 332 Ark. 398, 410, 966 S.W.2d 213, 219 (1998). (Emphasis added.)

In this case, the jury was instructed on first-degree and second-degree murder, and manslaughter, along with the requisite mental states. Appellant requested, but was refused, an instruction for the jury to consider whether she was justified in using deadly force. The proposed model jury instruction, based upon AMCI2d 705, instructed the jury to consider whether Kim reasonably believed that Phillip was committing or about to commit a felony with force or violence, specifically second-degree battery, and that she used only that force she reasonably believed necessary. *See also* Ark. Code Ann. § 5-2-607(a) (Repl. 1997). Arkansas law provides that one is not justified in using deadly physical force in self-defense if she knows that she can avoid the necessity of using that force with complete safety. *See also* Ark. Code Ann. § 5-2-607(b) (Repl. 1997).

Appellant argues that the trial judge substituted his belief for a decision rightfully left to the jury. The State argues that there was no evidence from which appellant could have reasonably believed

that the decedent was committing or about to commit a felony involving force or violence, in that the physical fight with Lisa was over, and further that appellant could clearly have retreated with complete safety. The State cites to *Martin v. State*, 290 Ark. 293, 718 S.W.2d 938 (1986).

In *Martin v. State, supra*, our supreme court held that Martin was not acting in self defense when he fatally wounded the victim, even though they had been engaged in a heated argument and the victim had allegedly threatened to kill Martin with a brick. The evidence revealed that Martin went to his car, retrieved a gun, and returned to encounter the victim. On those facts, Martin was not entitled to a justification instruction, and the trial court was upheld in refusing to instruct the jury on that defense.

■ Appellant's argument is compelling. Our standard on appeal is to determine if there is *any* evidence tending to support the existence of the defense, and that threshold has been met in this case. Kim testified that at the time she shot Phillip, she had just moments before witnessed him knock his wife unconscious with a single blow to her face. Kim had been told by Lisa of his violent history of getting into fights. Kim testified that she told him to leave the house, as she held a gun in her hand, whereupon Phillip, still visibly angry, "came at" her. This provides "any" evidence tending to support the giving of this instruction. It was for the jury, not the trial court, to make a factual determination of whether Kim was justified in her actions that day.[1]

■ The other point we clarify is our agreement with appellant that whether the number of shots fired was excessive is

---

[1] Pivotal to the determination of self defense is that the defendant had a "reasonable belief" that such force was necessary. *See* Original and Supplementary Commentary to Ark. Code Ann. § 5-2-607. The dissenting opinion maintains that there was no evidence that Phillip was committing or about to commit a felony involving force or violence when appellant used deadly force, explaining its evaluation of the evidence that it deems more persuasive. That is not the proper query. We are to determine only if appellant put on "any" evidence tending to support a reasonable belief on her part that Phillip was about to act in such a manner. Whether, in fact, she was reasonable in that belief is precisely the function of the jury, not the trial court. In addition, the dissenting opinion states that appellant could have retreated with complete safety. The dissent does not conclude as a matter of law that appellant knew she could avoid the use of that force by retreating with complete safety. *See* Ark. Code Ann. § 5-2-607(b). Indeed, how could we know if she knew? Again, this was a question for the jury to resolve. When we apply the proper standard of review, we must conclude that appellant met her burden of presenting "any" evidence tending to support the defense.

not relevant to whether the defense was sufficient to go to the jury in appellant's trial, particularly where there was no proof of the sequence of the gunshot wounds or which of them were "fatal." She cites to *Humphrey v. State, supra,* which stands for the proposition that once the defense is put in issue, it is the State's burden to establish that any excessive portion of the force used was the cause of the decedent's death. *Humphrey v. State,* 332 Ark. at 412. The State concedes that excessiveness is immaterial on these facts because it maintains that any deadly force, including the first shot, was unwarranted. The State's brief asserts that "excessive use of force does not prevent a self-defense instruction from being given, as the fact-finder always determines whether force was excessive."

In summation, we reverse and remand for a new trial because appellant was entitled to an instruction on justification. We next consider appellant's other arguments on appeal likely to arise upon retrial.

██ ██ Appellant contends that the trial court abused its discretion by not allowing defense counsel to query the pool of potential jurors about their attitudes toward the issue of self defense. A trial court's limitation of voir dire examination is not reversible on appeal unless it constitutes a clear abuse of discretion. *Fauna v. State,* 265 Ark. 934, 582 S.W.2d 18 (1979); *Parker v. State,* 265 Ark. 315, 578 S.W.2d 206 (1979). The conduct of voir dire in general is within the broad discretion of the trial judge. *Goodwin v. Harrison,* 300 Ark. 474, 780 S.W.2d 518 (1989). The State responds by pointing out that this issue is raised for the first time on appeal and is therefore not subject to appellate review. *See Ayers v. State,* 334 Ark. 258, 975 S.W.2d 88 (1998). The State is correct. Moreover, because we are reversing and remanding on the issue of justification, which necessarily encompasses self defense, we deem this issue moot.

██ For her third point on appeal, appellant argues that the trial judge abused his discretion by granting the State's motion in limine, which limited her psychological experts' testimony. Evidence of the defendant's mental condition, even if it does not show mental disease or defect sufficient to constitute a defense, is relevant on the issue of the culpable mental state. *Graham v. State,* 290 Ark. 107, 717 S.W.2d 203 (1986). The experts were allowed to testify regarding opinions and general testimony to demonstrate Kim's psychological history and treatment, past and present. How-

ever, defense counsel was not permitted to ask them about the impact of Kim's childhood sexual abuse on her mental condition. In defense counsel's proffer, Dr. Bradley noted her history of sexual abuse, but could not connect that abuse with her psychological conditions. In the proffer regarding Dr. Porter, she opined that the sexual abuse contributed to her having depression and anxiety. Appellant argues that excluding this portion of Dr. Porter's testimony was an abuse of discretion. The State asserts that there was no abuse of discretion because Dr. Porter, and certainly Dr. Bradley, could not causally connect her abuse and the shooting.

We hold that no abuse of discretion occurred. Appellant was allowed to present a great deal of evidence that she was a significantly impaired young woman and had been for some years. In addition, appellant herself had testified that she was the victim of sexual abuse between the ages of nine and twelve, committed by her older brother. Appellant stated that she had sought help from doctors, eventually being treated by Drs. Porter and Bradley. Furthermore, Lisa testified that she suspected Phillip had sexually abused their daughter, that she had told Kim about those suspicions, that Kim was unhappy that DHS had found Lisa's allegations against Phillip to be unsubstantiated, and that Kim had shared her own sexual-abuse history. We discern no abuse of discretion, and no prejudice resulting to appellant, by the trial court's exclusion of the limited portion of Dr. Porter's expert testimony. We do not reverse a decision by the trial court absent a showing of prejudice. *See Stivers v. State*, 354 Ark. 140, 118 S.W.3d 558 (2003).

Appellant's fourth issue on appeal is that the trial court violated her due process rights when it refused to give a modified version of jury instruction AMCI2d 610. The model instruction that was proffered reads:

### EFFECT OF MENTAL DISEASE OR DEFECT
### ON MENTAL STATE

[If you find that the defense of mental disease or defect has not been established,] evidence that KIM SHARP suffered from mental disease or defect may be considered by you in determining whether KIM SHARP had the requisite mental state to commit the offense charged or lesser included offenses.

Defense counsel had modified the instruction by deleting the portion in brackets because appellant had not asserted a defense by reason of insanity. The State responds that non-model jury instructions are not favored and should be given only when the model instructions do not correctly state or cover the necessary law. *Calloway v. State*, 330 Ark. 143, 953 S.W.2d 571 (1997). We hold that the trial court did not err.

The trial judge instructed the jury with preliminary model instructions on the duties of the jury and judge, presumptions and burden of proof, credibility determinations, and the like, concluding with instructions on first-degree murder, second-degree murder, and manslaughter, with the corresponding mens rea required to convict for those offenses. The manslaughter instruction required the State to prove that Kim caused Phillip's death "under circumstances that would be murder except that she caused the death under the influence of extreme emotional disturbance for which there was reasonable excuse" as viewed from her perspective.

Appellant essentially contends that by failing to instruct the jury again to consider any mental disease or defect with regard to the greater offenses, she was denied due process. We disagree.

■■■ The model criminal instructions shall be used unless the trial court concludes that they do not accurately state the law. *Webb v. State*, 326 Ark. 878, 935 S.W.2d 250 (1996); *Moore v. State*, 317 Ark. 630, 882 S.W.2d 667 (1994). In determining if the trial court erred in refusing an instruction in a criminal trial, the test is whether the omission infects the entire trial such that the resulting conviction violates due process. *Branstetter v. State*, 346 Ark. 62, 57 S.W.3d 105 (2001); *Conley v. State*, 270 Ark. 886, 607 S.W.2d 328 (1980). *See also Cox-Hilstrom v. State*, 58 Ark. App. 109, 948 S.W.2d 409 (1997). In the present appeal, the model jury instruction did not apply because appellant did not assert a defense of mental disease or defect. The accurate law was given to the jury by the instructions on all three offenses, and we affirm on this point.

Next, appellant challenges the trial court's ruling that excluded her request to admit a page from Phillip's deposition taken during the divorce proceedings to show that he admitted to having masturbated in the presence of Marina. Lisa had already testified that she had shared this information with Kim, and Kim had read the deposition at their house. Appellant asked to admit the page of

the deposition to bolster her credibility and to show a basis for her opinion of Phillip. The State objected on the basis that this evidence was already before the jury and that to allow it was "character assassination." The trial judge sustained the objection, pointing out that what was relevant was Kim's belief, not whether the event happened, and noting that he did not want to try the divorce case in this criminal trial because it was a collateral matter. Appellant argues that the trial court abused its discretion. We disagree.

Only if the defendant's credibility is attacked may her credibility be supported by other evidence. See *Williams v. State*, 329 Ark. 8, 946 S.W.2d 678 (1997). This is consistent with the general rule that the credibility of a witness cannot be bolstered until that witness has been impeached. See *id*. See also *McCormick on Evidence*, § 47 (4th ed. 1992); *George v. State*, 270 Ark. 335, 604 S.W.2d 940 (1980). The State did not challenge appellant's belief that Phillip had admitted to masturbating in the presence of his child. Any additional documentary evidence was therefore irrelevant as a collateral matter and inadmissible to bolster her credibility. We affirm on this point.

Lastly, appellant argues that the trial court abused its discretion in not allowing her to have Lisa's divorce attorney testify regarding proposed divorce documents that had been sent about a week prior to the shooting. Appellant asserts that the attorney's testimony would have been material and relevant to why Phillip "could have been in an angry mood" that morning, bolstering appellant's credibility about her version of what happened. The State responded at trial that whether documents were sent was not relevant to what appellant believed. On appeal, the State also counters appellant's argument by pointing out that appellant has urged approval of pure speculation — about whether he was in receipt of the documents; if received, what effect the documents had on him; and if angry, whether that had anything to do with his demeanor or action on the morning of the shooting.

Reviewing the ruling for abuse of discretion, we see none. Both Lisa and Kim testified that Phillip was very angry and agitated that morning, and both testified that each believed Phillip was angry at them regarding the sexual-abuse allegations. We cannot hold that the trial court's discretion was abused by preventing speculative and collateral matters to disrupt the trial.

After thorough consideration of appellant's contentions on appeal, we reverse and remand her conviction because the trial court erred in not instructing the jury on the defense of justification.

Reversed and remanded.

HART, BIRD, and ROAF, JJ., agree.

GLADWIN and NEAL, JJ., dissent.

ROBERT J. GLADWIN, Judge, dissenting. I dissent because there is simply no evidence that would warrant the trial judge giving a justification instruction.

A person is justified in using deadly physical force upon another person if he reasonably believes that person is committing or about to commit a felony involving force or violence. Ark. Code Ann. § 5-2-607(a)(1). Further, a person may not use deadly physical force in self defense if he knows he can avoid the necessity of using that force with complete safety. Ark. Code Ann. § 5-2-607(b).

Our role is not to weigh the evidence to determine if the justification instruction should have been given. Instead, the standard requires that we limit our consideration to whether there is any evidence tending to support the existence of a defense. *Humphrey v. State*, 332 Ark. 398, 966 S.W.2d 213 (1998).

There was no evidence that the victim, Phillip Joiner, was committing or was about to commit a felony involving force or violence. The testimony was that appellant saw Phillip Joiner strike Lisa Joiner, which caused her to fall on the floor. Appellant stated that Phillip Joiner "looked very angry." At that point, appellant left the scene. In other words, she had safely retreated, and the act of violence she witnessed was concluded. Moreover, that act was at most a misdemeanor battery, as there was no evidence of any serious physical injury. When appellant returned to the scene and saw that Lisa Joiner was back on her feet, the testimony indicates that she again could have safely retreated and avoided the use of deadly force. Instead appellant held a gun in her hand and told the victim to leave. Appellant testified that "he started to come at me," so she fired the weapon. According to appellant, Phillip Joiner did not fall after the first shot was fired, but rather "his body started kind of turning." Nevertheless, appellant continued firing shots at the victim until the gun was empty.

Looking angry and coming toward a person are not acts that can be reasonably construed as committing or being about to commit a felony involving force or violence. The majority gives a great deal of weight to all the information appellant had to show that she was afraid of the victim. However, her supposed fear of him is belied by the fact that she went to the Joiners' house that day because she knew that the victim would be there to pick up Marina and she wanted to invite him and Marina to join her for breakfast. Appellant, who could have retreated without the use of force, was not entitled to an instruction on justification.

NEAL, J., joins.