Cite as 2023 Ark. App. 592

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CR-23-185

| | |
|---|---|
| MINOR CHILD<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>APPELLEE | Opinion Delivered December 13, 2023<br><br>APPEAL FROM THE POPE COUNTY CIRCUIT COURT<br>[NO. 58JV-22-15]<br><br>HONORABLE KEN D. COKER, JR., JUDGE<br><br>AFFIRMED |

## WENDY SCHOLTENS WOOD, Judge

Minor Child (MC) appeals the Pope County Circuit Court's order adjudicating her delinquent and committing her to the Division of Youth Services following a jury trial at which she was found guilty of manslaughter. On appeal, MC argues that the circuit court abused its discretion by (1) admitting testimony about her prior bad acts; (2) excluding evidence of the victim's abusive conduct that MC sought to introduce in support of her justification defense; and (3) denying two motions for mistrial. We affirm.

On July 18, 2019, MC shot her father, Edward Arnold, in the chest with a 12-gauge shotgun as he slept on a couch in the family's living room. The shot went through Edward's heart, and he died within seconds. MC was fifteen years old at the time and was under juvenile-court supervision in a Family in Need of Services (FINS) case that had been filed

by Edward and MC's mother, Melinda. Less than three hours before the shooting, Edward discovered MC in her parents' bedroom smoking a cigarette and using a cell phone in violation of house rules and the FINS order. By all accounts, Edward became angry, was yelling at MC, and told her she was going back to juvenile detention or to another treatment facility. MC was made to sleep on a pallet on the living room floor with her parents sleeping nearby on couches. After both parents fell asleep, she went to her parents' bedroom, got her father's shotgun, and shot him as he slept.

Following the shooting, MC fled in Edward's truck. Melinda called 911, and police located MC a short time later in a school parking lot with her school friend and Mark McQuade, an adult male whom MC was not supposed to contact. MC was arrested and later gave a custodial statement to a Pope County deputy sheriff.

On August 19, the State charged MC as an adult[1] with murder in the first degree[2] and a firearm enhancement. MC's attorney filed a juvenile-transfer motion, and the circuit court held a hearing on November 18–19, 2021. Following the hearing, the court transferred jurisdiction of the case to the juvenile division of circuit court for an extended-

---

[1]Arkansas Code Annotated section 9-27-318(c)(2)(B) (Repl. 2015) authorizes the State to charge a juvenile as an adult if she is at least fourteen years old when she engages in conduct that, if committed by an adult, would be murder in the first degree under Arkansas Code Annotated section 5-10-102.

[2]A person commits murder in the first degree if with a purpose of causing the death of another person, the person causes the death of another person. Ark. Code Ann. § 5-10-102(a)(2) (Repl. 2013). A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1) (Repl. 2013).

juvenile-jurisdiction adjudication pursuant to Arkansas Code Annotated section 9-27-505 (Repl. 2020). The case was scheduled for a jury trial, and MC gave notice that she intended to present justification as a defense pursuant to Arkansas Code Annotated section 5-2-607.[3]

A jury trial was held on September 20–22, 2022. The 911 operator, law enforcement officers, MC's probation officer, her school friend, a forensic pathologist, MC, Melinda, a family friend, and MC's pastor testified. At the conclusion of the evidence, the jury was instructed on first-degree murder, statutory justification for the use of deadly force, and the lesser offense of extreme-emotional-disturbance manslaughter.[4] Following deliberations, the jury returned a verdict finding MC guilty of manslaughter, and on October 6, the circuit court entered an order adjudicating her delinquent and committed her to the Division of Youth Services. It further ordered supervised probation for twenty-four months after her release or until her twenty-first birthday and suspended imposition of an adult sentence. This appeal followed.

---

[3]Arkansas Code Annotated section 5-2-607 provides that "[a] person is justified in using deadly physical force upon another person if the person reasonably believes that the other person is . . . [i]mminently endangering the person's life or imminently about to victimize the person from the continuation of a pattern of domestic abuse." Ark. Code Ann. § 5-2-607(a)(3) (Repl. 2013).

[4]A person commits manslaughter if "the person causes the death of another person under circumstances that would be murder, except that he or she causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse." Ark. Code Ann. § 5-10-104(a)(1)(A) (Repl. 2013). The reasonableness of the excuse is determined from the viewpoint of a person in the actor's situation under the circumstances as the actor believed them to be. Ark. Code Ann. § 5-10-104(a)(1)(B).

## I. *Evidence of Prior Bad Acts*

For her first point on appeal, MC argues that the circuit court abused its discretion by admitting evidence of her prior bad acts in violation of Rules 404(b) and 403 of the Arkansas Rules of Evidence. Proof of other crimes, wrongs, or acts is not admissible merely to prove the character of the defendant to show that he acted in conformity with it. Ark. R. Evid. 404(a) (2022). Rule 404(b) provides that proof of other crimes, wrongs, or acts may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Ark. R. Evid. 404(b). The test for admissibility under Rule 404(b) is whether the evidence involving the defendant's character is independently relevant, meaning it tends to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence. *Atwood v. State*, 2020 Ark. 283, at 16; *Swanigan v. State*, 2019 Ark. App. 296, at 16, 577 S.W.3d 737, 748. Evidence may be relevant in connection with other facts or if it forms a link in the chain of evidence necessary to support a party's contention. *Swanigan*, 2019 Ark. App. 296, at 16, 577 S.W.3d at 748.

The admission or rejection of evidence under Rule 404(b) of the Arkansas Rules of Evidence is a matter left to the sound discretion of the circuit court and will not be disturbed absent a manifest abuse of discretion. *Huggins v. State*, 2021 Ark. App. 218, at 4, 624 S.W.3d 342, 345. Further, although relevant evidence may be excluded under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice,

4

confusion of the issues, or misleading the jury, the balancing mandated by Rule 403 is also a matter left to a circuit court's sound discretion. *Weir v. State*, 2023 Ark. App. 368, at 10, 675 S.W.3d 430, 437–38. This court will not reverse the circuit court's ruling absent a showing of manifest abuse. *Id.*, 675 S.W.3d at 438. In addition, this court will not reverse a ruling on the admission of evidence absent a showing of prejudice. *Riggins v. State*, 2021 Ark. App. 116, at 4, 619 S.W.3d 64, 66; *Sipe v. State*, 2012 Ark. App. 261, at 10, 404 S.W.3d 164, 170.

MC argues that the following evidence violates Rule 404(b): (1) the testimony of Jaime Davis, MC's probation officer in the FINS case, that MC's family sought the court's assistance in the FINS case in part because she had been caught "sneaking a boy into the home and having a sexual relationship with him" and had inappropriately used her cell phone; (2) the testimony of two deputy sheriffs that there had been an ongoing problem with MC contacting McQuade and allowing him into her home and that MC had run away; and (3) the testimony of MC and her mother that MC had a sexual encounter with McQuade and that her parents discovered him hiding in her bedroom closet one night, that MC had used her phone to take pictures of herself nude and to send them to people, that her parents were concerned and upset about her conduct, and that she had been disciplined for it.

The foregoing testimony concerns facts that led Edward and Melinda to file the FINS case seeking the court's help in addressing MC's misconduct.[5] The FINS order was entered just three weeks before MC killed Edward, and as previously noted, MC's smoking and cell-phone use in violation of the order is what prompted the confrontation that preceded the shooting. MC acknowledges that in a pretrial order, the circuit court ruled that the State would be permitted to introduce evidence about her FINS case and her relationship with McQuade as proof of her motive for killing her father. She does not challenge this ruling and, in fact, conceded below that her conduct involving the use of her phone and her involvement with McQuade was relevant to her motive. Further, MC stipulated to the admissibility of the FINS order at trial.

On appeal, MC nevertheless contends that pursuant to Rule 404(b), the circuit court should have excluded testimony that she had run away from home, used her cell phone inappropriately, allowed an adult male—McQuade—into the home, and had a sexual relationship with McQuade. She argues that this testimony was not independently relevant to any issue in the case; instead, it portrayed "[MC] as a bad kid who killed the decedent in conformity with her poor character as a homewrecker and sexually active teenager"—not one who was justified in killing her father in his sleep because she feared imminent death

---

[5]"Family in need of services" is defined as "any family whose juvenile evidences behavior that includes, but is not limited to . . . [b]eing habitually disobedient to the reasonable and lawful commands of his or her parent . . . or . . . [h]aving absented . . . herself from the juvenile's home without sufficient cause, permission, or justification[.]" Ark. Code Ann. § 9-27-393(23)(B), (C) (Supp. 2021).

6

or victimization from a continued pattern of domestic abuse. She further asserts that, to the extent the challenged testimony had any relevance, its probative value was grossly outweighed by the dangers of unfair prejudice and confusion of the issues.

The State responds that the testimony in question was independently relevant to the contested issues of MC's motive and intent for the murder and to negate MC's defense of justification. More specifically, the State argues that the testimony supports its theory that MC did not fear imminent physical danger from her father because he lay sleeping when she shot him, but rather, she shot him because she was angry about his efforts to correct her pattern of disobedient conduct and about the consequence of going back to juvenile detention or a treatment facility for violating the FINS order.

Our courts have said that intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances surrounding the killing. *Gaines v. State*, 340 Ark. 99, 111, 8 S.W.3d 547, 555 (2000). Where the purpose of evidence is to disclose a motive for a killing, anything that might have influenced the commission of the act may be shown. *Id.* at 108, 8 S.W.3d at 555. Evidence of circumstances that explain the act, show a motive, or illustrate the accused's state of mind may be independently relevant and admissible. *Id.*, 8 S.W.3d at 555.

Here, testimony about the serious nature and extent of MC's high-risk misconduct as an adolescent, which was not reflected in the FINS order itself, was relevant because it tended to show—as a counterpoint to MC's evidence of abuse—that Edward was a concerned parent who sought the FINS order to help his daughter. It further was relevant

7

because it helped to explain Edward's strong reaction to MC's violation of the FINS order on the night she killed him and to explain MC's understanding of the seriousness of her violation of the order and the likelihood that she would be confined again for treatment. The evidence thus supported the State's theory that MC did not kill her father because she feared imminent death or the continuation of abuse. Accordingly, we hold that the testimony concerning the nature of MC's prior misconduct in relation to the FINS case was relevant to the charge of murder under Rule 404(b).

The remaining question is whether, though relevant under Rule 404(b), the challenged testimony was nevertheless inadmissible because its probative value was substantially outweighed by the danger of unfair prejudice.[6] Proof that MC, as an adolescent, snuck an adult male into her home and engaged in a sexual relationship with him, sent inappropriate photos of herself to people, and ran away from home cast her in an unfavorable light. Our courts have noted, however, that there is always some prejudice that results from the mention of a prior bad act in front of the jury. *Thompson v. State*, 2019 Ark. 290, at 5, 586 S.W.3d 163, 166. The question under Rule 403 is whether the testimony caused unfair prejudice. As we have already noted, the challenged testimony was probative of the contested issue of MC's motive. Further, the witnesses gave only limited information about MC's misconduct and did not provide unnecessary details. Under these

---

[6]Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Ark. R. Evid. 403 (2022).

circumstances, we cannot say that MC was unfairly prejudiced by the introduction of the probative and relevant testimony concerning the nature of her prior bad acts underlying the FINS case. Accordingly, we hold that the circuit court did not abuse its discretion by admitting the testimony.

## II. *Exclusion of Evidence Relevant to MC's Justification Defense*

For her second point on appeal, MC argues that the circuit court abused its discretion by excluding evidence relevant to her claim that she acted in self-defense when she killed Edward. MC presents four separate arguments for reversal under this point.

### A. Melinda's Testimony About MC's Posttraumatic Stress Disorder (PTSD)

In a pretrial motion, the State moved to exclude MC's mother, Melinda, from testifying that MC was diagnosed with PTSD because of abuse she experienced from Edward. The State contended that Melinda was not qualified as a mental-health professional to diagnose MC with PTSD or to discuss how PTSD affects MC. In response, MC conceded that Melinda is not a trained medical professional. Yet, she argued that pursuant to Rule 701 of the Arkansas Rules of Evidence, Melinda should be permitted to testify, from her own observations and perception, that MC suffers from PTSD caused by Edward.

At the pretrial hearing on the motion, the court found that under Rule 701, Melinda would be permitted to testify about her observations and perceptions relevant to Edward's abuse of MC and its effects on MC, but it ruled that Melinda could not give the lay opinion pursuant to Rule 701 that her observations and perceptions, led her to

9

conclude that MC suffered from PTSD. The court stated, "I don't see the mother as being qualified to give an opinion on a psychiatric diagnosis of PTSD." On appeal, MC argues that the circuit court abused its discretion in precluding Melinda from testifying that MC was diagnosed with PTSD and the effect that PTSD has on her.

Opinion testimony by lay witnesses is allowed for observation of everyday occurrences or matters within the common experience of most persons. *Felty v. State*, 306 Ark. 634, 640, 816 S.W.2d 872, 875 (1991). Our supreme court has stated that the requirements of Rule 701 are satisfied if the opinion or inference is one that a lay person would form on the basis of the observed facts, but if an opinion without the underlying facts would be misleading, then an objection to it should be sustained. *Vasquez v. State*, 2022 Ark. App. 328, at 5, 652 S.W.3d 586, 589 (citing *Moore v. State*, 323 Ark. 529, 549, 915 S.W.2d 284, 295 (1996)). We review a circuit court's decision to allow lay-opinion testimony under Rule 701 for abuse of discretion. *Vasquez*, 2022 Ark. App. 328, at 5, 652 S.W.3d at 589.

Moreover, lay-witness testimony about a defendant's mental condition relevant to his or her culpable mental state at the time of the crime may be admissible under Rule 701. *Brown v. State*, 2016 Ark. App. 616, at 7–10, 509 S.W.3d 671, 675–77; *Graham v. State*, 290 Ark. 107, at 110, 717 S.W.2d 203, 204 (1986). The rule provides that if the witness is not testifying as an expert, her testimony in the form of opinions or inferences is limited to those opinions or inferences that are rationally based on the perception of the

witness and helpful to a clear understanding of her testimony or the determination of a fact in issue. Ark. R. Evid. 701.

Statements by eyewitnesses that a victim was "scared" and "trying to get away" fit within the limitations imposed on lay witnesses under Rule 701. *Vasquez*, 2022 Ark. App. 328, at 6, 652 S.W.3d at 590. The same is true of statements by witnesses that a defendant "goes to pieces" when under stress. *Graham*, 290 Ark. 107, at 110, 717 S.W.2d at 204. Similarly, in the case at bar, Melinda was permitted to testify in detail pursuant to Rule 701 about the abuse MC suffered at the hands of Edward.[7] Melinda was also allowed to testify about MC's mental state during her confrontation with Edward in the hours before and after the shooting. However, *Vasquez* and *Graham* do not support MC's assertion that Melinda should be permitted to offer a lay opinion that her observations of the abuse MC had experienced led her to believe that MC developed PTSD or that Melinda should be permitted to testify about "how [the PTSD diagnosis] affected [MC's] mental state."

Whether one has a psychological disorder because of her experience of trauma and how a psychological diagnosis affects one's mental state exceed the permissible limits of lay-opinion testimony under Rule 701 because they are not inferences that a lay person

---

[7]Melinda testified that Edward called MC derogatory names and hit her and choked her. She described one incident in which Edward choked MC in connection with her use of a cell phone and another incident in which he beat her with a belt when he found out that her grandmother had provided her with cell-phone service, even though she was not supposed to have a cell phone. She said he "whipped" MC after McQuade was found in her closet.

11

would form from the observed facts and are not within the common experience of most people. Ark. R. Evid. 701. Such opinions require "scientific, technical, or other specialized knowledge" that would bring such testimony within the scope of expert-witness testimony under Arkansas Rule of Evidence 702.[8] And MC conceded below that Melinda lacked specialized medical training. Therefore, we hold that the circuit court did not abuse its discretion in precluding Melinda from testifying that MC developed PTSD from Edward's abuse and how that diagnosis affected her mental state on the night of the shooting.[9]

### B. Dr. Morais's Expert Testimony About PTSD

MC argues that the circuit court erred by excluding the expert testimony of Dr. Hugo Morais, a clinical psychologist who diagnosed MC with PTSD. At trial, the State sought to preclude Dr. Morais's testimony about the psychological effects of PTSD because MC had not raised the affirmative defense that she lacked the mental capacity to form the

---

[8]Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ark. R. Evid. 702 (2022).

[9]We acknowledge MC's reliance on *Graham*, 290 Ark. at 110, 717 S.W.2d at 204; *Brown*, 2016 Ark. App. 616, at 6, 509 S.W.3d at 675; and Arkansas Code Annotated section 5-2-303 for the proposition that evidence that a defendant is suffering from a mental disease or defect is admissible to prove whether the defendant had the kind of culpable mental state required to commit a crime. MC argues that under these precedents, Melinda should have been "allowed to testify using the language of [MC's] diagnoses in her testimony and how this affected her mental state." This law is inapposite because on appeal, MC argues that Melinda's testimony about MC's PTSD diagnosis and the effect the diagnosis has on her is relevant to her justification defense—not to her culpable mental state. And as set forth in more detail in section II.B., evidence of MC's PTSD and its effects is irrelevant to the justification defense.

necessary intent for first-degree murder. In response, defense counsel asserted that the law permitted MC to introduce Dr. Morais's expert testimony because it was relevant to the issue of whether she acted with a purposeful mental state, regardless of whether she also asserted a defense of mental incapacity, and counsel requested an instruction on diminished capacity.

After further discussion, defense counsel changed course and said he was not offering Dr. Morais's testimony as it related to the issue of MC's purposeful culpable mental state for first-degree murder. He said that he was offering Dr. Morais's testimony to explain the reasonableness of MC's belief under the justification statute that she was in imminent danger of death or of being victimized by Edward as the result of a pattern of domestic abuse. The State objected to the admissibility of the testimony on that basis because expert testimony would not assist the jury in determining what a person would think is reasonable under the justification statute.

The circuit court noted that under the justification jury instruction and statute, a reasonable belief is one that an ordinary and prudent person would form under the circumstances in question and not a belief formed recklessly or negligently. The court stated, "So we're looking at that old reasonable prudent man fellow. That's the standard here." Under this standard, the court found that Dr. Morais's testimony about how MC's PTSD affects her would not be of assistance to the jury in determining whether MC's belief of imminent physical danger was reasonable. The court sustained the State's objection but allowed MC to proffer Dr. Morais's testimony.

13

Whether one is justified in using deadly force upon another person is generally a factual question for the jury to decide. *Brown*, 2020 Ark. App. 198, at 5, 595 S.W.3d at 459. Expert testimony is admissible on the issue when it will aid the jury to understand the evidence presented or to determine a fact in issue. Ark. R. Evid. 702; *Harris v. State*, 295 Ark. 456, 748 S.W.2d 666 (1988); *see also* Ark. R. Evid. 401 (defining "relevant evidence"). We review rulings on the admissibility of expert testimony for an abuse of discretion. *Stewart v. State*, 316 Ark. 153, 158, 870 S.W.2d 752, 755 (1994).

On appeal, MC argues that Dr. Morais's testimony is admissible because it is relevant to her justification defense—"to the objective reasonableness of her belief in the need to use force" against Edward. She relies on *Sharp v. State*, 90 Ark. App. 81, 204 S.W.3d 68 (2005), where this court stated that expert testimony about a defendant's mental condition, even if it does not show mental disease or defect sufficient to constitute an affirmative defense, may be admissible if it is relevant to the defendant's culpable mental state. *Id.* at 93, 204 S.W.3d at 76.

*Sharp* is not implicated here. As we have noted, MC expressly stated that she was not offering Dr. Morais's testimony to disprove her purposeful culpable mental state. She proffered Dr. Morais's testimony on the narrow issue of whether her belief that her life was in imminent danger or that she was imminently about to be victimized in a continuation of a pattern of domestic abuse was reasonable. If jurors find that a defendant's belief of imminent physical harm was reasonable and that she used only such force as was reasonably necessary, the justification statute requires an acquittal even if the

14

defendant acted with a purposeful culpable mental state. *See* AMI Crim. 2d 705 (informing jurors that they must find the defendant not guilty if they believe she held a reasonable belief of imminent harm and used only such force as was reasonably necessary). *Sharp*'s holding that expert testimony may be admissible to disprove the necessary culpable mental state, therefore, does not inform the analysis of the narrow issue before this court.

As framed by MC, the issue presented revolves around the justification statute, which provides: "A person is justified in using deadly physical force upon another person if the person reasonably believes that the other person is . . .[i]mminently endangering the person's life or imminently about to victimize the person . . . from the continuation of a pattern of domestic abuse." Ark. Code Ann. § 5-2-607(a)(3); *see also* AMI Crim. 2d 705 cmt. __ ("'Reasonably believes' or 'reasonable belief' is defined in Ark. Code Ann. § 5-1-102."). Section 5-1-102 (Supp. 2019) defines "reasonably believes" or "reasonable belief" as a belief (1) that an ordinary and prudent person would form under the circumstances in question, and (2) not recklessly or negligently formed. Ark. Code Ann. § 5-1-102(18). This court has emphasized that "the defendant's belief must be objectively reasonable and not arrived at via fault or carelessness." *Brown*, 2020 Ark. App. 198, at 5, 595 S.W.3d at 460; *Kauffeld v. State*, 2017 Ark. App. 440, at 9, 528 S.W.3d 302, 309. Thus, under the foregoing statutory framework, the reasonableness of MC's belief that she was in imminent harm that called for the use of deadly force is judged by an objective standard. And the measure of her reasonableness is the belief that an ordinary and prudent person would form under the circumstances in question.

15

In his proffered testimony, Dr. Morais said his PTSD diagnosis was based, in part, on MC's account of her experience of intense physical violence by her father and her reported symptoms of nightmares and distressing memories of the abuse. Dr. Morais testified that people with PTSD, including MC, may, due to cognitive distortion, interpret a general stressor as life threatening and that such a stressor may trigger a reaction because people with PTSD have a low threshold for activation of the fight-or-flight response.

It is not relevant that MC, because she suffers from PTSD, had a subjective belief that she was in imminent danger of being victimized. Instead, the issue is whether a reasonable person under the circumstances would have believed that she or he was in imminent danger. Therefore, Dr. Morais's testimony that MC has PTSD would not assist the jury in determining whether her belief was objectively reasonable. In fact, such testimony might confuse the jury by causing it to think that MC's diagnosis should be considered, despite the jury instruction—based on the justification statute—telling them that the standard is that of an "ordinary and prudent person." Accordingly, we cannot say that the circuit court abused its discretion in excluding Dr. Morais's testimony.

C. Recording of Melinda and Edward

Melinda recorded an argument between her and Edward four days before the shooting. In the seven-minute recording, Edward is verbally abusive to Melinda, calling her derogatory names and threatening to "knock her in the head." In a pretrial hearing, the circuit court considered the State's motion to exclude the recording on grounds that it was not relevant to MC's defense and, alternatively, was unduly prejudicial. The State

16

noted that the recording had been made days before the shooting, that it did not concern abuse of MC herself, and that Melinda had previously indicated that MC was not present when the argument occurred. In response, MC asserted that the recording was relevant to her justification defense to show a history of domestic abuse in the home that MC had experienced or was aware of, and the probative value of the recording outweighed the risk of unfair prejudice. The circuit court ruled that the recording was relevant to show a pattern of domestic abuse, and it conditioned the admissibility of the recording on the presentation of a proper foundation showing that MC had knowledge of the argument before she killed Edward. At trial, the circuit court reconsidered its ruling and excluded the recording after considering additional argument, including the State's argument that the language of the justification statute referring to "victimization from a continued pattern of domestic abuse" means victimization of the defendant, not third parties.

On appeal, MC argues that the circuit court abused its discretion by excluding the recording of Edward's verbal abuse of Melinda. Citing *Schnarr v. State*, 2017 Ark. 10, at 7, MC contends that the general rule that a victim's prior acts of violence that are known to a defendant may be probative of whether the defendant reasonably believed he was in imminent physical danger to justify self-defense. She asserts that she proffered testimony that she knew of the recorded argument and showed how it affected her state of mind at the time of the shooting. She further contends that had the jury heard the recording, she might have been acquitted.

Although MC asserts in her brief that she proffered testimony at trial showing that she had knowledge of the recording, her citations to the record do not reflect that she did so. Absent a record demonstrating a proper foundation for the introduction of the recording, we cannot say the circuit court abused its discretion by excluding it. *See Halfacre v. State*, 277 Ark. 168, 172, 639 S.W.2d 734, 736 (1982) (holding that absent knowledge of a victim's prior violent acts, they cannot have informed the defendant's reasonable belief of imminent harm and will be inadmissible). Further, we cannot say the circuit court abused its discretion by restricting evidence of Edward's prior bad acts to those directed at MC, considering that the premise of her justification defense was that she had a reasonable belief that *she* was imminently about to be victimized from a continuing pattern of domestic abuse. To the extent that evidence of Edward's abuse of third parties bore some relevance to MC's perception of imminent harm, the evidence risked jury confusion. Ark. R. Evid. 403. And finally, we cannot say that the exclusion of the seven-minute recording of Edward threatening Melinda was prejudicial because MC and Melinda testified not only about disparaging comments Edward made to MC and derogatory names he called her, but also about physical abuse he inflicted on both her—by hitting, slapping, choking, whipping, and punching her—and on family pets in MC's presence.[10] Under the

---

[10]MC testified that, when she was between seven and nine years old, her father began to abuse her verbally and physically, usually when she would break the rules—like talk back to him, smoke a cigarette, or have a phone. She said he would hit, slap, kick, or choke her and estimated that he had done so about one hundred times over the span of seven years. She described one incident in which, because she had used a cell phone, he struck her with a belt on her bare skin twenty-five times until she had welts and bruises

18

circumstances, the seven-minute recording of verbal abuse would have added little to MC's first-person account of abuse inflicted directly on her by Edward. We will not reverse an evidentiary ruling absent a showing of prejudice. *Montgomery v. State*, 2019 Ark. App. 376, at 6, 586 S.W.3d 188, 194. Accordingly, we affirm the circuit court's decision to exclude the recording.

## D. Exclusion of Other Third-Party Abuse

MC argues that the circuit court abused its discretion by excluding testimony about Edward's abuse of Melinda and two of MC's older half siblings, Amber and Tyler, who left the home more than a decade earlier when MC was no more than five years old. MC argues that the court's ruling limiting the admissible evidence of Edward's abuse to that which directly involved MC prevented her from informing the jury that Edward had abused her siblings in "bizarre, cruel ways[.]" She cites *Smith v. State*, 273 Ark. 47, 616 S.W.2d 14 (1981), for the proposition that our supreme court "routinely reverses homicide convictions when a trial court improperly restrict[s] presentation of a justification defense by excluding prior violent acts of the decedent." However, in *Smith*, the circuit court

---

and bled. She said that he would tell her she was worthless and selfish and call her derogatory names (b**ch, dumb***, whore, f***ing idiot) almost every day, noting that he had done so in front of their pastor to whom Edward had taken her for counseling about her behavior. She said that Edward abused her mother and siblings and also her pets. She described one incident in which her father had taped her cat's feet together, threw the cat on the roof, and would not help her get down. She also described an incident in which he made her kill her dog by helping her pull the trigger after the dog had begun chasing their chickens. When asked about a photograph in which she is posing next to a dead dog, she said, "I thought that's just what we did. We did that with deer and other kills like that."

improperly prohibited evidence of any prior altercations between the defendant and the victims. *Id.* at 49, 616 S.W.2d at 15. Here, the circuit court did not prohibit any testimony about the abuse that Edward inflicted on MC, which was the relevant issue in establishing her justification defense.

Further, during her testimony, MC briefly mentioned that her father had abused her mother and her siblings, although she did not provide any details of the abuse. The jury, thus, had some awareness of Edward's abuse of others. Finally, this court has held that a circuit court does not abuse its discretion by placing temporal limitations on the admission of evidence of a victim's violent acts. *Roberts v. State*, 2018 Ark. App. 332, at 10, 552 S.W.3d 446, 451–52. Here, the abuse of MC's siblings had occurred more than a decade before the trial.

Under these circumstances, we cannot say that the circuit court abused its discretion, nor can we say that MC suffered prejudice, considering the previously mentioned testimony that was admitted without restriction regarding Edward's abuse of MC. We affirm the circuit court's decision to exclude the evidence of abuse inflicted on Melinda and MC's half siblings.

### III. *Mistrials*

For her last point on appeal, MC challenges the circuit court's denial of two motions for mistrial. A mistrial is an extreme remedy that will be granted only when there has been an error so prejudicial that justice cannot be served by continuing the trial. *Anderson v. State*, 2023 Ark. App. 397, at 7, 675 S.W.3d 453, 457. The circuit court is in a

favorable position to evaluate potential prejudice, so this court defers to its discretion in these matters. *Id.*, 675 S.W.3d at 457. This court will not reverse the circuit court's decision in the absence of an abuse of discretion. *Id.*, 675 S.W.3d at 457. The abuse-of-discretion standard is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Riggins*, 2021 Ark. App. 116, at 4, 619 S.W.3d at 66; *Brown v. State*, 2019 Ark. App. 36, at 2, 568 S.W.3d 312, 313. In determining whether a circuit court abused its discretion in denying a mistrial motion, our courts consider whether an admonition to the jury could have cured any resulting prejudice. *Thompson v. State*, 2019 Ark. 290, at 4–5, 586 S.W.3d at 165.

## A. MC's Threat to Melinda

On cross-examination, the State asked MC if she had ever threatened to harm her mother. MC's counsel objected and moved for a mistrial, claiming that he had not asked MC if she was a peaceful person; thus, the State was not permitted to impeach her character for peacefulness. The State contended that it had wide latitude on cross-examination and further noted that MC did not answer the question. The circuit court denied the motion and directed the State to "move on."

On appeal, MC argues that the circuit court abused its discretion by denying her request for a mistrial when the State asked her if she had ever threatened her mother. She contends that whether she had threatened her mother was irrelevant in her trial for murdering her father, and the insinuation that she had done so was prejudicial. For

21

reversal, she points to cases reversing denials of mistrial requests where State's witnesses testified to the defendants' prior bad acts that were unrelated to the charged offense.

We hold that the circuit court did not abuse its discretion in denying MC's motion for mistrial. First, contrary to MC's argument, her state of mind at the time of the shooting was relevant to both her intent and her justification defense. Evidence that MC threatened her mother with the shotgun after she had just used that gun to shoot and kill her father undermines MC's claim of self-defense.

Additionally, evidence that MC had threatened Melinda after the shooting had already been admitted into evidence at trial without objection. For example, prior to the State's question that drew the first mistrial motion, Melinda's 911 call was played for the jury. Melinda can be heard on the recording stating that she (Melinda) had the gun and was "not letting it go 'cause [MC] was going to shoot [Melinda]" and "was going to use [the gun] on me." In MC's custodial statement, which was also played for the jury, the detective stated, "[T]his is important," and "Your mom had told me for just a moment that you kind of turned in her direction with the shotgun . . . what was the deal with that?" MC gave a lengthy answer in which she indicated it was possible that her mother could have thought MC pointed the gun at her.

Not only had evidence that MC threatened Melinda been introduced into evidence without objection before the mistrial motion was made, it was also introduced into evidence after the mistrial motion was made. The State continued its cross-examination of MC and inquired, without objection, if she heard her mother say in the 911 call that MC

"had tried to kill her." MC acknowledged her mother said it but denied having pointed the gun at her mother. Also, after the mistrial motion had been denied, Melinda testified, without objection, that she told the 911 operator that MC had tried to shoot her and that she told law enforcement that MC pointed the gun at her (Melinda) and that she (MC) said, "I didn't want to have to do this."

Because evidence that MC threatened Melinda with the shotgun that MC used to shoot and kill Edward was admitted into evidence—without objection—before and after the mistrial motion, and because MC did not answer the question at issue, we hold that MC has failed to demonstrate that the circuit court's denial of her motion for mistrial was an error so prejudicial that justice cannot be served by continuing the trial. We affirm this point.

B. Admission of the Recording of an Argument between Edward and Melinda

As previously discussed, in a pretrial ruling, the circuit court denied the State's motion to exclude a recording that Melinda made of Edward verbally abusing her. The circuit court found that it was relevant on the issue of whether there was a pattern of domestic abuse for purposes of MC's justification defense. The court found that the recording was admissible if a proper foundation was made at trial.

At trial, however, during MC's testimony, the circuit court reconsidered the admissibility of the recording and excluded it on the basis that the abuse and threats contained in the recording were directed to Melinda—not MC—and therefore the contents of the recording were not relevant to MC's justification defense. In response, MC moved

23

for a mistrial, arguing that she was prejudiced by the circuit court's reversal because her lawyers had relied on the initial ruling that the recording was admissible, and counsel told the jury in opening statement that they would hear the recording. MC's counsel told the jury that "Eddie says such wonderful things of 'I'm going to knock you in the head,' says that multiple times. And he says, 'I'm going to knock you the f*** out.'" MC's counsel argued that when the circuit court changed its ruling and the jury did not hear the recording, counsel lost credibility with the jury because it appeared as though counsel had lied.

The circuit court denied MC's counsel's mistrial motion. In response, counsel requested an admonition, and the court granted the request. The court read the jury an instruction prepared by MC's counsel specifically admonishing the jurors to "draw no inferences" from any evidence regarding the domestic abuse of people other than MC that was mentioned in opening statements but subsequently deemed inadmissible by the court.

On appeal, MC reasserts her contention that the circuit court abused its discretion in denying her motion for a mistrial after it reversed its initial decision to admit the recording of the argument between Melinda and Edward. MC argues that the reversal of the circuit court's pretrial ruling occurred "so late in the game" and warranted a mistrial because it "dashed [MC's] carefully constructed trial strategy that was built on the [circuit] court's pretrial rulings," which included telling the jury in opening statement that they would hear the recording. We disagree.

24

First, a circuit court's ruling on a motion in limine is not a final ruling and is subject to reconsideration and change by the court during trial. *Conagra, Inc. v. Strother*, 68 Ark. App. 120, 126, 5 S.W.3d 69, 73 (1999). Second, a review of the record discloses that the circuit court made it very clear to the parties that its initial ruling that the admissibility of the recording was conditioned on laying a foundation that MC had personal knowledge of the recording, which at that time had not been established. Nevertheless, MC's counsel elected to mention the recording in opening statement before counsel had an opportunity to admit the evidence. The risk of this strategy was known to MC's counsel. Albeit in a different context, the circuit court warned MC's counsel of telling jurors in opening statement about prior bad-acts evidence before it was admitted, stating, "And if they don't come in, then [counsel] look[s] like the bad guy." MC's counsel acknowledged the risk stating, "I don't plan on saying anything in opening that I will not get into court."

Third, while the recording—evidence of Edward's verbal abuse of Melinda—was not admitted in evidence, the circuit court permitted MC and Melinda to testify about years of continual abuse MC suffered at the hands of Edward, including the abuse MC said had occurred when she was found smoking and using a cell phone before she killed Edward in his sleep.

Finally, the circuit court is afforded broad discretion in ruling on a motion for mistrial, and a mistrial will not be declared when the prejudice can be removed by an admonition to the jury. *Bell v. State*, 334 Ark. 285, 303, 973 S.W.2d 806, 816 (1998). Here,

25

the jurors were admonished in a nonmodel instruction to disregard counsel's remarks in opening statement regarding the contents of the recording:

> The introduction of evidence in court is governed by law, and you should accept without question the Court's rulings as to the admissibility or rejection of evidence, drawing no inferences that by these rulings I have in any manner indicated my views on the merits of the case. *As a result of the Court's rulings, certain things relating to domestic abuse of people other than* [MC], *as stated in opening statement, were subsequently held not admissible. As such, you should draw no inferences regarding any lack of evidence regarding those topics.*

(Emphasis added.)[11] Given the wide latitude afforded circuit courts in acting on mistrial motions, we see no abuse of discretion, and we affirm on this point.

Affirmed.

ABRAMSON, J., agrees.

HIXSON, J., concurs.

**KENNETH S. HIXSON, Judge, concurring**. I agree with the majority that this case must be affirmed on the basis of the applicable laws enacted by our legislature and the Arkansas Model Jury Instructions that track the language of those statutes. However, I write this concurring opinion to express my position that the legislature—or perhaps the Supreme Court—could, and perhaps should, reconsider since the statutes fail to consider our emotionally and mentally challenged population.

---

[11]The jury was also given the following instruction: "Opening statements, remarks during the trial, and closing arguments of the attorneys are not evidence but are made only to help you in understanding the evidence and applicable law. Any argument, statement, or remarks of attorneys having no basis in the evidence, should be disregarded by you." AMI Crim. 2d 101(f).

To begin with, I am not referring to situations in which a defendant does not have the requisite mental ability to appreciate his[1] conduct or cannot participate in his defense. Rather, I am referring to the narrow issue of where a defendant's mental or emotional condition may affect his ability to avail himself of the justification defense. During trial, the circuit court excluded Dr. Morais's testimony regarding his post-incident diagnosis that appellant suffered from posttraumatic stress disorder (PTSD) and that her response to events on the evening in question was affected by her PTSD. The circuit court determined that such expert testimony would not be helpful to the jury, ostensibly under Arkansas Rule of Evidence 702. The jury was allowed to hear extensive testimony regarding the appellant's previous conduct and behavior and her father's alleged participation and contribution to it, but the jury was not allowed to hear expert testimony that could explain her resultant reaction. Recall that the defense proffered Dr. Morais's testimony only for the narrow purpose to support and prove appellant's justification defense, specifically the *reasonableness* of appellant's belief that she was imminently about to be victimized by her father from the continuation of a pattern of domestic abuse under Arkansas Code Annotated section 5-2-607(a)(3) (Repl. 2013). When asked what effects appellant might have if she was still experiencing trauma at the time of the shooting, Dr. Morais proffered that "[i]t would be certainly sufficient to – to trigger intense traumatic responses that can include numbing; that can include brief dissociation; can include re-experiencing a previous traumatic memories

---

[1]For ease of communication and without discrimination, I am using the masculine "he" and "his" in this opinion.

27

and feelings." He went on to explain that "[t]he [fight] or flight response, which is very easily triggered in individuals who have PTSD, is difficult for them to bring down to a baseline following a traumatic event. So three hours later would be well within an interval in which [appellant could still experience] active symptoms of – of PTSD." On appeal, appellant argues as she did below that this testimony was necessary to explain the reasonableness of her belief that she was about to be victimized by her father from the continuation of a pattern of domestic abuse under Arkansas Code Annotated section 5-2-607(a)(3).

The majority opinion unfortunately, but correctly, concludes that appellant's PTSD disability is irrelevant to the reasonableness of her actions because the reasonableness standard must be judged on an objective basis under our existing statute and case law. The comment to AMI Crim. 2d 705, the model jury instruction for the applicable justification defense pursuant to Arkansas Code Annotated section 5-2-607(a)(3), states that "'[r]easonably believes' or 'reasonable belief' is defined in Ark. Code Ann. § 5-1-102." Arkansas Code Annotated section 5-1-102(18) (Repl. 2013) states the following definition:

(18) "Reasonably believes" or "reasonable belief" means a belief:

(A) That an *ordinary and prudent person* would form under the circumstances in question; and

(B) Not recklessly or negligently formed[.]

(Emphasis added.) In addition, our case law on this issue has explained that the defendant's belief must be *objectively* reasonable and not arrived at via fault or carelessness. *See Kauffeld*

28

*v. State*, 2017 Ark. App. 440, 528 S.W.3d 302. Accordingly, it does not matter if appellant's conduct was *subjectively* reasonable on the basis that she had PTSD.

In other words, under the applicable statutes and case law, it does not matter if appellant's actions were reasonable for a person that had been "triggered" because of her PTSD condition or disability; instead, it matters only if the ordinary and prudent person with no disabilities or conditions would have done the same thing. To make matters worse, the statutory definition does not limit only *mental disabilities* from being considered by the jury. Physical disabilities such as blindness, deafness, amputated limbs, and other physical disabilities would also be excluded from consideration. Perhaps, crudely asked, can a blind person avail himself of the justification defense if he has to prove that his decision or conduct was that an *ordinary and prudent person* would form under the circumstances in question? Can a deaf person avail himself of the justification defense if he has to prove that his decision or conduct was that an *ordinary and prudent person* would form under the circumstances in question? To allow persons with physical disabilities to be justified in their actions but not persons with mental or emotional challenges or disabilities to be justified in their actions would be an affront to the monumental strides we have taken in the education and diagnoses of emotional and mental conditions. Without intending a pun, dare we turn a blind eye to our fellow citizens who are not ordinary and prudent?

I cannot conclude that the legislature intended to exclude a person's mental and physical challenges or disabilities in determining the reasonableness of a person's actions and therefore invite the legislature to revisit its legislation in this regard. However, because

29

the circuit court's ruling was accurate according to the law as it currently stands, I must concur in the affirmance of appellant's conviction. Having said this, I make no opinion on whether allowing such testimony in the case at bar would have affected the jury's verdict.

*Lassiter & Cassinelli*, by: *Michael Kiel Kaiser*, for appellant.

*Tim Griffin*, Att'y Gen., by: *David L. Eanes, Jr.*, Ass't Att'y Gen., for appellee.