Cite as 2024 Ark. 23

# SUPREME COURT OF ARKANSAS

**No.** CR–23–486

| | | |
|---|---|---|
| | | **Opinion Delivered:** February 22, 2024 |
| ROYCE CALKINS | | APPEAL FROM THE STONE |
| | APPELLANT | COUNTY CIRCUIT COURT |
| | | [NO. 69CR-21-36] |
| V. | | |
| | | HONORABLE TIM WEAVER, JUDGE |
| STATE OF ARKANSAS | | AFFIRMED. |
| | APPELLEE | |

**JOHN DAN KEMP, Chief Justice**

Appellant Royce Calkins appeals a Stone County Circuit Court order convicting him of two counts of first-degree murder and sentencing him to two consecutive terms of life imprisonment, plus a fifteen-year sentencing enhancement to each term for using a firearm. For reversal, Calkins (1) challenges the sufficiency of the evidence supporting his first-degree-murder convictions, and (2) argues that the circuit court abused its discretion by denying his proffered jury instructions on justification and kidnapping. We affirm.

## I.  *Facts*

On March 9, 2021, Calkins's girlfriend, Brandy Patrick, and his father, Ronald "Ron" Calkins, were shot and killed in a home shared by Calkins and Ron. Brandy's son, Bradley Cates, checked on her when he got off work that day, discovered their bodies, and called 911. Chief Deputy Sheriff Dammon McGilton responded to the 911 call and encountered Cates, who was standing in the front yard, crying. McGilton entered the residence and saw

Brandy's and Ron's dead bodies. He also observed that Ron had a gun in his left hand that "appeared to be posed." McGilton secured the scene, alerted the Arkansas State Police, and obtained a search warrant. Once officers obtained a warrant and reentered the house, they saw that both victims had been shot multiple times and noted significant damage to Ron's left wrist. It was later confirmed that Brandy had been shot four times and Ron had been shot six times. Additionally, Ron's brother, Steven Calkins, testified that Ron was right-handed and that he had been unable to use his left index finger since he was a child because of a gun-loading incident.

On the day of the murders, Calkins called his stepfather, Donald Milton, from Ron's cell phone. Milton asked Calkins what was going on because he knew that something was not right. Calkins replied that "it's bad . . . it's as bad as it gets . . . they were going to take me or make me go to the doctor or something." Milton responded, "[T]hey're just trying to help you." Calkins told Milton, "I'm tired of their shit. It don't matter. They're gone." Calkins refused to keep talking unless Milton purchased a different phone. Milton then called the sheriff's office.

Following the murders, Calkins also went to the home of a family friend, Dale Daggett. Calkins arrived there in Ron's truck, holding Ron's cell phone. Daggett asked Calkins, "[W]hy don't you go home[?]" Calkins told him that "it's really bad over there." Daggett then asked if they were breathing, and Calkins "shook his head no."

Law enforcement quickly developed Calkins as a suspect, and he was taken into custody that evening. As he was being arrested, Calkins spontaneously said, "I just said a

prayer. I'm so sorry for what happened. It was an accident." Calkins also told an intake officer at the jail that he had a broken heart because of what he had done.

In custody, Calkins told a cellmate, Galan Langley, that he had shot his girlfriend and his father and that he had put the gun in his dad's hand when he left to make it look like a murder-suicide. Langley recalled that Calkins spoke openly about the murders during his first few days in jail but then "clammed up" after another inmate began coaching him about asserting an insanity defense. Langley wrote a letter to the Van Buren County jail administrator recounting Calkins's admission to him about killing his girlfriend and his father. Calkins further told Langley that the firearm he used to kill his father and his girlfriend was obtained from a friend that was a border patrol agent. Calkins told Langley that he panicked after he shot Brandy and Ron and that he gathered up a few thousand dollars and called a lawyer before he was arrested.

At trial, several witnesses testified about their knowledge of Calkins's relationship with Ron. Milton testified that he had never seen Ron be physical with, or lift a hand to hurt, Calkins but that Ron had tried to help him out in life. Daggett testified that Ron "did everything for [Calkins] that he could" and that Ron "bent over backwards to try and help him." Daggett explained that Calkins also frequently had seizures, and Ron had helped him with that condition as well. Daggett had seen Calkins exhibit aggressive behavior toward his father, including "kicking at his daddy and punching at him." But he had never seen Ron retaliate; he had only seen him try to get away from Calkins. Another family friend, Theresa Price, testified she had previously heard Calkins threaten to kill his father. She said that Ron "was terrified of [Calkins.]"

3

Leslie Hodge, Calkins's ex-girlfriend and the mother of his two children, testified that she had never seen Ron physically injure or threaten Calkins, but she had seen Calkins physically injure or threaten Ron four or five times. Hodge never saw Ron fight back during these attacks. He would typically cower down and "try to either leave the room or dissolve the situation." Hodge and Brandy were friends, and she had never observed Brandy exhibit any violence toward Calkins. Hodge once advised Brandy to leave Calkins because he was violent. Calkins called Hodge several times from jail following his arrest. In one conversation that was played for the jury, Calkins stated that "people were coming to take advantage of [him]" and that "[y]ou fuck with [him] you see where you end up."

Prior to trial, Dr. Abigail Taylor, a physician at the Arkansas State Hospital, performed court-ordered fitness-to-proceed and criminal-responsibility evaluations on Calkins. She concluded that he did not have a mental disease or defect and had the capacity to appreciate the criminality of his conduct, to conform his conduct to the requirements of the law, and to form the culpable mental state required as an element of the offense.

At trial, Dr. Taylor testified that Calkins recounted to her the events preceding the murders. Calkins told Dr. Taylor that the night before the murders, he had a seizure around dinner time. He and Brandy had been arguing, and she had been "telling [him] what to do all night." For example, she told him to go lie down in "a bedroom that didn't have any windows[.]" He also said that Brandy told Ron to plug a heater into an upstairs outlet that he believed did not work. Calkins said he thought "there was more going on than [he] was really understanding."

4

According to Dr. Taylor, Calkins told her that he continued to have seizures the next morning and that "Brandy started hassling him." She told him that she was a secretary to the KKK. She said that there was a "contract bond" and that he "had 15 minutes to figure it out," but he also said that he didn't know what she meant by that. Calkins told Dr. Taylor that he had "a lot of nice things. [He] thought they were going to take [his] things." He also told Dr. Taylor that his father was being rude and threatened to "make all the decisions for [him]."

Calkins told Dr. Taylor that at some point, "[he] freaked out. [He] got scared to death. He said they were on either side of him. They were messing with him. [He] thought they were going to hurt [him]." He grabbed a gun and shot Ron first and then Brandy. When Dr. Taylor asked Calkins whether he knew at the time that shooting them was illegal, he acknowledged that he did but that he thought he was defending himself. Dr. Taylor also testified that she had concerns about Calkins's honesty during the evaluations due to inconsistencies in his statements to her.

At the close of the State's case, Calkins's trial counsel moved for a directed verdict, arguing that there was no proof that Calkins "intended to kill anyone." The circuit court denied the motion, and the defense rested its case without presenting any evidence. During the discussion of jury instructions, Calkins's trial counsel requested that an instruction be given on justification and on kidnapping, as the underlying felony for the justification instruction. He claimed that evidence supporting the instructions was introduced through Dr. Taylor's testimony. The circuit court declined to give the instructions, and Calkins's trial counsel proffered them.

Calkins was convicted of two counts of first-degree murder, and the jury found that he had used a firearm in the commission of the offenses. He was sentenced to two consecutive terms of life imprisonment for the murders plus a fifteen-year sentencing enhancement on each life term for using a firearm. He filed a timely notice of appeal.

## II. *Points on Appeal*

### A. Sufficiency of the Evidence

Although presented as Calkins's second point on appeal, double-jeopardy considerations require this court to review a challenge to the sufficiency of the evidence before we review the other issues on appeal. *McKee v. State*, 2020 Ark. 327, at 5, 608 S.W.3d 584, 589. Calkins argues that the circuit court erred in denying his motion for directed verdict on the two charges of first-degree murder. He contends that there was no evidence offered to show purpose—the requisite mental state for the first-degree murders for which he was charged.

We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *McClendon v. State*, 2019 Ark. 88, at 3, 570 S.W.3d 450, 452. In reviewing this challenge, we view the evidence in a light most favorable to the State and consider only the evidence that supports the conviction. *Id.*, 570 S.W.3d at 452. We will affirm the verdict if substantial evidence supports it. *Id.*, 570 S.W.3d at 452. Substantial evidence is evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id.*, 570 S.W.3d at 452. It is the function of the jury—not the reviewing court—to evaluate the credibility of witnesses

and to resolve any inconsistencies in the evidence. *Breeden v. State*, 2013 Ark. 145, at 5, 427 S.W.3d 5, 8–9.

To sustain a charge of first-degree murder, the State had to prove that with a purpose of causing the deaths of Brandy and Ron, Calkins did cause their deaths. Ark. Code Ann. § 5-10-102(a)(2) (Supp. 2019). "A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result[.]" Ark. Code Ann. § 5-2-202(1) (Repl. 2013). Intent is seldom capable of proof by direct evidence and must usually be inferred from the circumstances surrounding the killing. *Collins v. State*, 2021 Ark. 35, at 5, 617 S.W.3d 701, 704. The intent necessary for first-degree murder may be inferred from the type of weapon used, the manner of its use, and the nature, extent, and location of the wounds. *Id.*, 617 S.W.3d at 705. It is axiomatic that one is presumed to intend the natural and probable consequences of one's actions. *Ward v. State*, 2023 Ark. 158, at 6, 676 S.W.3d 270, 274. A jury may properly consider an attempt to cover up one's connection to a crime as proof of a purposeful mental state. *Leaks v. State*, 345 Ark. 182, 186, 45 S.W.3d 363, 366 (2001).

Here, substantial evidence supports both counts of first-degree murder because evidence offered at trial demonstrated Calkins's purpose. Calkins shot Brandy four times, and he shot Ron six times. Calkins then attempted to conceal his involvement by planting the gun in Ron's left hand to make it appear as though it was a murder-suicide, and he fled the scene. Calkins told multiple people about shooting Brandy and Ron, and he told his cellmate about his attempt to cover up his connection to the crime by placing the gun in Ron's hand. *See id.*, 45 S.W.3d at 366. Given these facts when viewed in the light most

favorable to the State, the jury could reasonably infer that Calkins acted purposely when he shot and killed Brandy and Ron. Thus, we hold that the circuit court properly denied his motion for directed verdict, and we affirm on this point.

## B. Jury Instructions

Next, Calkins argues that the circuit court abused its discretion by rejecting his proposed jury instructions on justification and kidnapping. He claims that evidence was presented through Dr. Taylor's testimony that Calkins thought Ron and Brandy were going to hurt him, that he was in imminent danger, and that he was defending himself when he killed them.

We have stated that there must be a rational basis in the evidence to warrant the giving of a jury instruction. *Bridges v. State*, 2023 Ark. 157, at 7, 676 S.W.3d 275, 279. When the defendant has offered sufficient evidence to raise a question of fact concerning a defense, the instructions must fully and fairly declare the law applicable to that defense; however, there is no error in refusing to give a jury instruction when there is no basis in the evidence to support the giving of the instruction. *Id.*, 676 S.W.3d at 279. This court has affirmed a circuit court's refusal to submit a proffered jury instruction when the only basis for the instruction was the defendant's self-serving statements or testimony, contradicted by other witnesses. *Id.*, 676 S.W.3d at 279. We will not reverse the circuit court's refusal to submit an instruction to the jury absent an abuse of discretion. *Id.*, 676 S.W.3d at 279. An abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Collins v. State*, 2019 Ark. 110, at 5, 571 S.W.3d 469, 472.

In the present case, Calkins sought a justification jury instruction based on Arkansas Code Annotated section 5-2-607, which states:

(a) A person is justified in using deadly physical force upon another person if the person reasonably believes that the other person is:

> (1) Committing or about to commit a felony involving physical force or violence;

> (2) Using or about to use unlawful deadly physical force; or

> (3) Imminently endangering the person's life or imminently about to victimize the person from the continuation of a pattern of domestic abuse.

Ark. Code Ann. § 5-2-607(a)(1)–(3) (Supp. 2019). A reasonable belief is the belief that an ordinary and prudent person would form under the circumstances, not one that is recklessly or negligently formed. Ark. Code Ann. § 5-1-102 (Repl. 2013). Calkins also sought an instruction on kidnapping as the "felony involving physical force or violence" referenced in the justification instruction. The kidnapping instruction was based on Arkansas Code Annotated section 5-11-102 (Repl. 2013), which states, in pertinent part, that "[a] person commits the offense of kidnapping if, without consent, the person restrains another person so as to interfere substantially with the other person's liberty with the purpose of" facilitating the commission of any felony, inflicting physical injury upon the other person, or terrorizing the other person. Ark. Code Ann. § 5-11-102(a)(3), (4) & (6).

In rejecting Calkins's proposed justification instruction, the circuit court found that

[t]he justification instruction requires that Royce Calkins reasonably believed that Ronald Calkins and Brandy Patrick were using or were about to use unlawful deadly physical force, which I find there's no evidence been submitted. . . . There's nothing in this record that the jury could find either one of those things. That he reasonably believed that either of the decedents were using or were about to use unlawful deadly

9

physical force. There was this statement they were going to make him go into a room with no windows. That maybe a cord—a plugin cord to a heater might have been smoking. There's no evidence before the Court that—unlawful deadly physical force or that his life was in imminent danger.

It further found, with respect to kidnapping, that

to sustain this defense[,] he must show the following things. First, that Ronald Calkins and/or Brandy Patrick, did without consent restrain him so as to interfere substantially with his liberty. He never says that. He never says that in Ms. Taylor's discussion with him. And that Ronald Calkins and/or Brandy Patrick restrained Royce Calkins with the purpose of facilitating the commission of any felony. There's no evidence of that. Or inflicting physical injury upon him. And there's no testimony of that. Or terrorizing him. And there's no testimony to any of that.

We see no abuse of discretion in the circuit court's refusal to instruct the jury on justification and kidnapping because there was no rational basis in the evidence for those instructions. Calkins asserts that his own statements, which were introduced through Dr. Taylor's testimony, constituted sufficient evidence to warrant giving the instructions. Specifically, he points to his statements to Dr. Taylor that Brandy told Ron to plug a space heater into an outlet that Calkins believed did not function, that Brandy told him to go lie down in a bedroom without windows, and that Brandy told him that she had a "contract bond" and that he had fifteen minutes to figure it out. However, Calkins told Dr. Taylor that he did not know what Brandy meant by the term "contract bond." Calkins also never indicated to Dr. Taylor that anyone pushed him into a room, and he never said that he was afraid he was going to be killed. Additionally, although Calkins told Dr. Taylor that he "thought they were going to hurt [him,]" multiple witnesses testified that they had never observed any aggression from the victims toward Calkins, but they had seen him become physically violent toward Ron on several occasions. Theresa Price had even heard Calkins

10

threaten to kill Ron. Further, Calkins's ex-girlfriend testified that she had advised Brandy to leave Calkins because he was violent, and she was scared for Brandy.

On the basis of the facts presented at trial, we hold that the circuit court did not abuse its discretion in rejecting the proffered instructions because there was no evidence that Calkins reasonably believed the victims were committing or about to commit a felony with force or violence, including kidnapping, that they were using or about to use unlawful deadly physical force, or that Calkins's life was in imminent danger. Thus, we affirm on this point.

## C. Rule 4–3(a)

Because Calkins received life sentences, this court, in compliance with Arkansas Supreme Court Rule 4–3(a), has examined the record for all objections, motions, and requests made by either party that were decided adversely to Calkins. No prejudicial error has been found. We therefore affirm.

Affirmed.

*Hogue Corbitt & Ward PLC*, by: *David R. Hogue*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Jacob H. Jones*, Ass't Att'y Gen., for appellee.