Cite as 2025 Ark. 139

# SUPREME COURT OF ARKANSAS

**No.** CR–24–842

| | |
|---|---|
| CHRISTOPHER MCDANIELS<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>APPELLEE | **Opinion Delivered:** September 25, 2025<br><br>APPEAL FROM THE DESHA COUNTY CIRCUIT COURT [NO. 21ACR-23-106]<br><br>HONORABLE ROBERT B. GIBSON III, JUDGE<br><br>AFFIRMED. |

**NICHOLAS J. BRONNI, Associate Justice**

A Desha County jury convicted Christopher McDaniels of first-degree murder for killing his grandmother's husband, James Petty, and sentenced him to life in prison. McDaniels appeals, arguing that there was insufficient evidence to support his conviction and that the circuit court abused its discretion by admitting testimony that he told a witness he wanted to "get" Petty by burning down his grandmother's house. We reject both arguments and affirm.

## Facts and Procedural Background

On July 15, 2023, McDaniels stabbed Petty more than two dozen times in his grandmother's kitchen and then dragged Petty's lifeless body down the house's front porch steps, down the driveway, and into the street. Covered in blood and holding the "long-ass knife" that he had used to kill Petty, McDaniels then threatened passersby, warning them not to "come down my meemaw's street." When police arrived, McDaniels attempted to flee and had to be tased and subdued. McDaniels never denied killing Petty, claiming he

did so in self-defense. The jury rejected that claim and convicted McDaniels of first-degree murder.

On the day that he killed Petty, McDaniels had only recently been released from his latest stint in prison; McDaniels has a lengthy criminal record, including five previous felony convictions. Following his release, McDaniels was staying at his grandmother's house. McDaniels "didn't care for" his grandmother's husband, Petty, and admitted that on the day of the murder, he and Petty argued and that he was "pissed off." Indeed, earlier that day, McDaniels told his grandmother's next-door neighbor, Neal Charleston, that he could not get into the house and that "if his grandmother wasn't there, he'd get him and burn down the house." Charleston assumed McDaniels was speaking figuratively because, while he seemed "sort of mad because he couldn't get [inside the house] or something," he did not seem angry when he made the comment. McDaniels never denied making the comment.

McDaniels later returned to his grandmother's house. Petty was the only other person home, and McDaniels and Petty began arguing and "getting into it on the [screened-in] porch" attached to the house. At trial, McDaniels testified that Petty allowed him into the house and that Petty snuck up behind him in the kitchen with a knife. McDaniels claimed that when Petty tried to stab him, he "caught the blade" of the knife with his hand and killed Petty in self-defense in the ensuing struggle.

The forensic evidence told a different tale. Dr. Charles Kokes, the forensic pathologist who performed Petty's autopsy, testified that Petty suffered twenty-five sharp-force cuts and wounds to his neck, forearms, shoulders, face, scalp, and back—some of which penetrated Petty's bones and even chipped his skull. Petty's forearm injuries were

2

consistent with defensive wounds, suggesting Petty had attempted to shield himself or struggled to grab the knife from McDaniels. And the wounds to Petty's front and back revealed that Petty had fallen facedown on the kitchen floor and had been repeatedly stabbed—a fact corroborated by photographic evidence showing a large pool of blood in that area. Dr. Kokes's testimony further established that Petty had died from the total loss of blood from all his wounds, not from any individual wound. He concluded that the sheer volume of stab wounds indicated that Petty had been deliberately killed.

After stabbing Petty, McDaniels dragged Petty's body outside, down his grandmother's driveway, and into the street. Nichosha Lison, McDaniels's childhood acquaintance, witnessed McDaniels drag Petty toward the street, saw him sit on Petty, and heard him warn passersby not to come down the street. Not long after, Lance Shurtleff drove by and recognized Petty lying in the street. Shurtleff called 911 and got out of his truck to check if Petty was responsive. McDaniels then approached him. Seeing McDaniels covered in blood and holding the knife that he had used to kill Petty, Shurtleff quickly retreated to his vehicle. McDaniels told Shurtleff that he "had to" and that he "wasn't no punk." When Shurtleff insisted that they needed to help Petty, McDaniels tried to reach through the vehicle window and grab Shurtleff's cell phone. With his young son in the back seat, Shurtleff pulled the child out of McDaniels's reach and drove off.

Police soon arrived. Deputy Wayna Green found Petty lying facedown with a large knife beside his body. When Green approached McDaniels, McDaniels moved away and was noncompliant. After resisting arrest, officers tased McDaniels six times before finally subduing and taking him into custody.

3

The State charged McDaniels with first-degree murder. Before trial, McDaniels moved to exclude Charleston's testimony that Petty had told him that, if his grandmother were not home, he would get Petty and burn the house down. McDaniels argued the remark was not relevant and was significantly more prejudicial than probative. The circuit court denied the motion, finding the statement relevant to McDaniels's state of mind and concluding that its probative value was not substantially outweighed by any risk of unfair prejudice.

At McDaniels's ensuing jury trial, Dr. Kokes, Shurtleff, Lison, Charleston, Green, and several other witnesses testified. The State also introduced the murder weapon, photographs of the crime scene, and DNA evidence. When the State concluded its case-in-chief, McDaniels moved for a directed verdict, arguing only that the State had failed to prove he had intended to cause Petty's death. The circuit court denied the motion, concluding that the State had presented sufficient evidence from which the jury could conclude that McDaniels had acted purposely.

McDaniels then took the stand in his own defense. He admitted killing Petty, but he claimed that he did so in self-defense. In confusing and contradictory testimony, McDaniels ultimately claimed that Petty had initially denied him entry into the house; that they "were talking shit"; that Petty had suddenly stabbed him in the kitchen; and that in the ensuing struggle, he had killed Petty. He also claimed that after repeatedly stabbing Petty, he had tried to help him by dragging him down the front stairs and into the street. McDaniels did not present any evidence corroborating his account of the murder.

4

After testifying, McDaniels renewed his directed-verdict motion, and when asked by the circuit court whether he wished to add anything to his original motion, McDaniels declined, stating that he had "[n]o additional bases" for his motion. Thus, as particularly relevant here, in his renewed motion, McDaniels did not argue that the State had failed to negate his self-defense claim, opting instead to simply rely on his claim that the State had failed to show that he acted intentionally. The circuit court again denied the motion.

The jury found McDaniels guilty of first-degree murder and sentenced him to life in prison. McDaniels timely challenges that conviction.

## Discussion

McDaniels raises two arguments on appeal. First, he argues that his conviction was not supported by sufficient evidence. On this point, he claims both that the State did not prove that he purposely killed Petty and that the State's evidence failed to negate his self-defense claim. We reject both variations of this argument; the former on the merits; and the latter because it was not raised below. Second, McDaniels argues that the circuit court abused its discretion and unduly prejudiced his defense when it permitted Charleston to testify that McDaniels had told him, on the day of the murder, that if his grandmother were not home, he would get Petty and burn her house down. But contrary to McDaniels's claim, Charleston's testimony was relevant to determining McDaniels's intent on the day of the murder and did not create an unfair risk that the jury would resolve this case on an improper basis. We accordingly affirm McDaniels's conviction.

<u>Sufficiency Challenge</u>

McDaniels argues that his first-degree-murder conviction is not supported by sufficient evidence. He claims both that the State failed to prove that he purposely killed Petty, within the meaning of the first-degree-murder statute, and that the State failed to disprove his self-defense justification claim. We decline to reach McDaniels's self-defense argument because it is not preserved. We reject McDaniels's other argument on the merits.

1. Start with McDaniels's self-defense claim. Justification is a defense to first-degree murder, and it applies when a defendant "reasonably believes" that the other person is "[u]sing or about to use unlawful deadly force" or is "[c]ommitting or about to commit a felony involving physical force or violence." Ark. Code Ann. § 5-2-607(a) (Repl. 2024). When a defendant puts forth "any evidence tending to support" a justification claim, disproving justification becomes an element of the offense, and the State must disprove it beyond a reasonable doubt. *Gentry v. State*, 2021 Ark. 26, at 5; *Humphrey v. State*, 332 Ark. 398, 410, 966 S.W.2d 213, 219 (1998); *see also* Ark. Code Ann. § 5-1-102(5)(c). McDaniels argues that the State did not meet that burden here.

McDaniels never made that argument below, and as such, we may not reach it now. Arkansas Rule of Criminal Procedure 33.1 governs sufficiency challenges. It requires a defendant to make a directed-verdict motion based on sufficiency below to mount such a challenge on appeal. *See Bridges v. State*, 2023 Ark. 157, at 4, 676 S.W.3d 275, 278; *see also* Ark. R. Crim. P. 33.1(c) ("The failure of a defendant to challenge the sufficiency of the evidence at the times and in the manner required . . . [by this rule] will constitute a waiver of any question pertaining to the sufficiency of the evidence to support the verdict or

6

judgment."). That rule likewise does not permit generic objections but requires the defendant to "state the specific grounds" for his motion. Ark. R. Crim. P. 33.1(a). Indeed, Rule 33.1(c) makes clear that "[a] motion merely stating that the evidence is insufficient does not preserve for appeal issues relating to a specific deficiency such as insufficient proof on the elements of the offense."

In a nutshell, then, to argue the State failed to present sufficient proof on any element on appeal, the defendant must also have done so below. *See Hayes v. State*, 2020 Ark. 297, at 10 ("To preserve a challenge to the sufficiency of the evidence, an appellant must . . . advise[] the circuit court of the exact element of the crime that the State has failed to prove."); *see also Bridges*, 2023 Ark. 157, at 4, 676 S.W.3d at 278 ("A defendant is bound by the scope and nature of his directed-verdict motion at trial and cannot change the grounds on appeal."). That means Rule 33.1 prevents us from reaching an argument that "the State ha[s] failed to negate self-defense" where the defendant argued below only that there was insufficient evidence to demonstrate the defendant acted purposefully. *Haynie v. State*, 2025 Ark. 46, at 3, 709 S.W.3d 46, 48; *see also Bridges*, 2023 Ark. 157, at 4, 676 S.W.3d at 278 ("[A]n argument that the State failed to negate self-defense [is] unpreserved when the appellant [makes] only a general motion to the circuit court and [does] not specify how the State's proof was insufficient to meet its burden.").

That rule controls here. At trial, McDaniels made two directed-verdict motions challenging the sufficiency of the evidence—one at the conclusion of the State's case-in-chief and one at the conclusion of his own case. Neither motion argued that the State had failed to disprove his self-defense claim. Instead, he only argued that the State had failed to

7

demonstrate that he had acted purposely. That, as we explained in *Haynie*, is insufficient to preserve a justification sufficiency challenge, and as such, Rule 33.1 bars us from reaching the merits of McDaniels's self-defense claim.

2. By contrast, McDaniels properly preserved his challenge to the sufficiency of the State's evidence that he purposely killed Petty. On a sufficiency challenge, we ask whether there was sufficient evidence from which the jury could conclude that the State carried its burden, without resorting to speculation or conjecture. *See, e.g.*, *Wyles v. State*, 2024 Ark. 128, at 3, 696 S.W.3d 296, 298. We do not second-guess the jury's credibility determinations or its resolution of conflicting evidence. *Id*. Rather, we "view[] the evidence in the light most favorable to the State" and may only consider evidence supporting the verdict. *Id*. Conducting that review, we reject McDaniels's second argument on the merits.

To convict a defendant of first-degree murder, the State must prove beyond a reasonable doubt that the defendant purposely caused the victim's death. *See* Ark. Code Ann. § 5-10-102(a)(2); Ark. Code Ann. § 5-2-202(1) (Repl. 2024) (it must be the "conscious object" of an individual to "cause the result"). Such "[i]ntent is seldom capable of proof by direct evidence and must usually be inferred from the circumstances surrounding the killing." *Calkins v. State*, 2024 Ark. 23, at 7, 682 S.W.3d 681, 686. Thus, as we have explained, intent "may be inferred from the type of weapon used, the manner of its use, and the nature, extent, and location of the wounds." *Id*. Intent may also be inferred from the defendant's broader conduct, including efforts to conceal a crime, the defendant's attempts to flee or resist apprehension, and the defendant's own statements. *See, e.g.*, *Wyles*,

2024 Ark. 128, at 5, 696 S.W.3d at 299; *Keesee v. State*, 2022 Ark. 68, at 15–16, 641 S.W.3d 628, 640; *Brunson v. State*, 368 Ark. 313, 324, 245 S.W.3d 132, 141 (2006).

Applying these principles here, the State provided sufficient evidence to support a finding that McDaniels purposely killed Petty. McDaniels inflicted twenty-five cut and stab wounds on Petty's neck, forearms, shoulders, face, scalp, and back—several of which were deep enough to penetrate bone. Defensive wounds on Petty's forearm also suggested that he tried to fend off the attack, and Dr. Kokes testified that multiple other wounds indicated that Petty had been repeatedly stabbed after he fell facedown on the kitchen floor. And photographic evidence corroborated that account. Collectively, then, the forensic evidence shows a "prolonged struggle and repeated application of deadly force" where McDaniels intended to kill Petty. *See Cone v. State*, 2022 Ark. 201, at 9, 654 S.W.3d 648, 656; *Wofford v. State*, 2023 Ark. 138, at 5, 675 S.W.3d 137, 140. Indeed, it is hard to believe that anyone would inflict twenty-five stab and cut wounds without intending to cause death. *See Wyles*, 2024 Ark. 128, at 5–7, 696 S.W.3d at 299–300 (holding that the jury properly rejected defendant's emotional-disturbance defense in light of the number and nature of stab wounds inflicted); *Calkins*, 2024 Ark. 23, at 7, 682 S.W.3d at 686 ("It is axiomatic that one is presumed to intend the natural and probable consequences of one's actions."). So from the "nature and the extent of the wounds alone," the jury could properly conclude that McDaniels intended to kill Petty. *See Cone*, 2022 Ark. 201, at 9, 654 S.W.3d at 656.

Beyond that, McDaniels's own statements and conduct before and after the murder support the jury's conclusion that McDaniels intended to kill Petty. For instance, hours before the murder, McDaniels told Charleston that "if his grandmother wasn't there, he'd

9

get him and burn down the house." The jury could reasonably conclude that McDaniels's desire to "get him" was directed at Petty and reflected an intent to harm him. And while McDaniels argues that statement had little probative value since Charleston called it figurative, *see infra* p. 12, the jury was entitled to weigh that explanation against both Charleston's testimony that at the time of the remark McDaniels was "sort of mad" and McDaniels's own admission that he was "pissed off" at Petty. Moreover, McDaniels's conduct after killing Petty—dragging him down the front stairs and into the street, sitting on his corpse, warning passersby not to come down the street, interfering with Shurtleff's efforts to check on Petty, and resisting arrest—all suggest consciousness of guilt. *See Cypert v. State*, 2025 Ark. 11, at 12, 705 S.W.3d 496, 502 (failure to render aid after use of deadly weapon is indicative of intent); *Keesee*, 2022 Ark. 68, at 15, 641 S.W.3d at 640 (attempt to avoid arrest suggests consciousness of guilt).

In sum, the State easily met its burden here. The forensic evidence alone provided sufficient evidence of McDaniels's intent for the jury to conclude that he purposely killed Petty. McDaniels's threats, admissions, and postcrime conduct simply added to the narrative. And the jury's finding that McDaniels acted with purpose in killing Petty did not rest on speculation or conjecture. We reject McDaniels's argument to the contrary.

<u>Evidentiary Objection</u>

McDaniels also argues that the circuit court abused its discretion when it allowed Charleston to testify that McDaniels told him that "if his grandmother wasn't there, he'd get him and burn down the house." McDaniels contends the statement was not relevant;

10

was substantially more prejudicial than probative; and unfairly prejudiced his defense. That claim fares no better than his sufficiency challenge.

Begin with relevance. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." Ark. R. Evid. 401. That is not a high bar, and to meet it, evidence need not "prove the entire case or even [resolve] a single issue." *Echols v. State*, 326 Ark. 917, 957, 936 S.W.2d 509, 529 (1996); *accord United States v. Rivera Calderon*, 578 F.3d 78, 97 (1st Cir. 2009) ("[A] piece of evidence need not conclusively establish the existence of a fact to be considered relevant."). It must merely be probative and material. *See United States v. Gomez*, 763 F.3d 845, 853 (7th Cir. 2014). Applying that standard, in substantially similar circumstances, we previously held that "[t]hreats made by a defendant prior to the time a homicide occurred" were relevant and admissible to prove intent because they tended "to establish motive and ill will." *Gaines v. State*, 340 Ark. 99, 111, 8 S.W.3d 547, 555 (2000).

Just the same here, McDaniels's statement is plainly relevant because it suggests that, shortly before the murder, he harbored hostility toward Petty. In response, McDaniels claims that his statement is not relevant because (1) Charleston testified that he thought it was figurative; and (2) it concerned arson, not murder. But Rule 401 does not exclude threats merely because they describe violent acts different in kind from the charged offense; it is enough that the threat reflects hostility or intent toward the victim. *See Teague v. State*, 328 Ark. 724, 727, 946 S.W.2d 670, 671 (1997) (threat that the defendant would "gut her like a deer" relevant in charge of aggravated assault from firing a gun). And whether the statement was meant literally or figuratively was a question for the jury. *See supra* at 10. So

11

ultimately, McDaniels's objections—that the remark concerned arson or was meant only figuratively—go to weight, not admissibility. *Cf. Webb v. State*, 327 Ark. 51, 62, 938 S.W.2d 806, 813 (1997).

McDaniels alternatively argues that, even if relevant, his statement should have been excluded under Rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice. To make the showing, he simply asserts that Charleston's testimony was "highly prejudicial" and hurt his case. That is not enough. Far from it, by definition, relevant evidence is always prejudicial to the opposing side's case, and any time the State introduces relevant evidence, that evidence will be prejudicial to the defendant. *See Vance v. State*, 2011 Ark. 243, at 23, 383 S.W.3d 325, 341 (holding that "evidence offered by the State in a criminal trial is likely to be prejudicial to the defendant to some degree, otherwise it would not be offered"). So merely saying the State introduced prejudicial—even highly prejudicial—evidence does not mean anything. Indeed, the more relevant, the more prejudicial the evidence. *Cf. United States v. Yellow*, 18 F.3d 1438, 1442 (8th Cir. 1994) ("Here, the evidence . . . was no doubt prejudicial, but primarily because its probative value was great.").

Instead, Rule 403 targets a narrower category of things—namely, evidence that produces "unfair prejudice." *See United States v. Neeley*, 189 F.3d 670, 682 (7th Cir. 1999) (applying federal analog and explaining that "most evidence is, by its very nature, prejudicial, and that evidence must be unfairly prejudicial to be excluded"). Only evidence that has a "tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one" meets that standard. *Berry v. State*, 290 Ark. 223, 233, 718 S.W.2d 447,

453 (1986) (citing the advisory committee's commentary to Fed. R. Evid. 403); *see also United States v. Gabe*, 237 F.3d 954, 960 (8th Cir. 2001) (applying federal analog).

Nothing in the record suggests that McDaniels's statement would have led the jury to decide the case on some improper basis. After all, it was permissible for the jury to consider the statement as evidence of McDaniels's intent to harm Petty. *See supra* p. 10. And in the absence of any showing that the evidence would provoke an emotional or improper decision, the circuit court did not abuse its discretion in admitting the statement. *See Laswell v. State*, 2012 Ark. 201, at 13–14, 404 S.W.3d 818, 826–27 (finding no abuse of discretion where, over Rule 403 objections, the court admitted defendant's statement that he wanted to live a "thug life").

## 4-3(a) Review

Because McDaniels was sentenced to life imprisonment, Ark. Sup. Ct. R. 4-3(a) applies. McDaniels did not include the list of all adverse rulings on objections, motions, and requests made by either party required by the rule, but the State did and McDaniels has not disputed that list. Accordingly, we conducted the review required by Rule 4-3(a) and no prejudicial error exists here.

Affirmed.

WOOD, J., concurs.

BAKER, C.J., dissents.

13

**KAREN R. BAKER, Chief Justice, dissenting.** Due to the fact that McDaniels

failed to submit a brief in compliance with Arkansas Supreme Court Rule 4-3(a), I write

separately because it is premature to reach the merits without a compliant brief properly

before the court. Rule 4-3(a) mandates that

> [w]hen the sentence is death or life imprisonment, the Court must review all errors
> prejudicial to the appellant in accordance with Ark. Code Ann. Sec. 16-91-113(a).
> To make that review possible, the appellant *must* include, in addition to the contents
> required by Rule 4-2, *a list of all rulings adverse to him or her* made by the circuit court
> on all objections, motions and requests made by either party, and the list *must* include
> the information needed for an understanding of each adverse ruling and the page
> number where each adverse ruling is located in the appellate record.

(Emphasis added.) In the present case, McDaniels's brief does not contain the above-

required list of adverse rulings. When this precise scenario arose last spring, the court

directed the appellant "to file a substituted brief that complies with Rule 4-3(a) within

fifteen days." *See Overton v. State*, No. CR-24-21 (Ark. Mar. 19, 2025) (rebriefing ordered).

Consistent with this, instead of reaching the merits, I would direct McDaniels to file a

substituted brief that complies with  Rule 4-3(a).

*Vicki Lucas*, for appellant.

*Tim Griffin*, Att'y Gen., by: *David L. Eanes, Jr.*, Ass't Att'y Gen., for appellee.